# In The United States Court Of Appeals For The Tenth Circuit

-------------------------------- -------------------------------

## ALPINE SECURITIES CORPORATION,

*Plaintiff-Appellant*,

v.

## NATIONAL SECURITIES CLEARING CORPORATION, THE DEPOSITORY TRUST & CLEARING CORPORATION, and THE DEPOSITORY TRUST COMPANY

*Defendants-Appellees*,

## UNITED STATES OF AMERICA,

*Intervenor for Defendant-Appellee.*

-----------------------------------------------------------------

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH 2:23-cv-00782 JNP JCB

-----------------------------------------------------------------

### APPELLANT'S BRIEF

-----------------------------------------------------------------

Aaron D. Lebenta (10180)
**CLYDE SNOW & SESSIONS, P.C.**
201 South Main Street, Suite 2200
Salt Lake City, Utah 84111
Tel/Fax: 801.322-2516
adl@clydesnow.com

Maranda E. Fritz
Maranda E. Fritz PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231
maranda@fritzpc.com

*Counsel for Plaintiff-Appellant Alpine Securities Corporation*

### ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

ATTACHMENTS ................................................................................. iii

PRIOR OR RELATED APPEALS .................................................... viii

GLOSSARY OF ABBREVIATIONS .................................................. viii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES .....................................................................2

STATEMENT OF THE CASE.................................................................3

   1.   Overview of DTCC and its Subsidiaries ..........................................3

   2.   The Clearing Agencies' Capital Requirements ...............................5

   3.   After Alpine Filed This Case, the Clearing Agencies Commenced a "Cease to Act" Proceeding Against Alpine...................................7

   4.   Relevant Proceedings Before the District Court ............................9

SUMMARY OF THE ARGUMENT ....................................................11

STANDARD OF REVIEW ..................................................................16

ARGUMENT .......................................................................................17

   I.   The Clearing Agencies Exercise Federal Power Through Their Regulatory and Enforcement Functions ......................................20

   II.   Alpine Has Stated a Valid Claim that the Clearing Agencies Violate the Private Nondelegation Doctrine By Wielding Federal Power ....................24

      A.   The Clearing Agencies' Regulatory Actions Violate the Private Nondelegation Doctrine ........................................27

      B.   The Clearing Agencies' Enforcement Powers Violate the Private Nondelegation Doctrine ........................................32

   III.   The District Court Erred in Dismissing Alpine's Article II Appointment and Removal Claims........................................42

      A.   The Clearing Agencies' Structure Does Not Comply with Article II .......42

4924-3943-9184, v. 1

B. The District Court Applied the Wrong Test in Holding the Clearing Agencies Are Not Subject to Constitutional Requirements ......................47

IV. Alpine's Due Process Claim is Viable and Was Properly Before the District Court ...........................................................................................................50

CONCLUSION ........................................................................................................54

STATEMENT OF ORAL ARGUMENT ................................................................54

CERTIFICATE OF COMPLIANCE ......................................................................56

CERTIFICATE OF DIGITAL SUBMISSION .......................................................57

## ATTACHMENTS

**A    Memorandum Decision and Order Granting Defendants' Motion to Dismiss entered March 25, 2025 in Case No. 2:23-cv-00782-JNP-JCB**

**B    Judgment entered March 25, 2025 in Case No. 2:23-cv-00782-JNP-JCB**

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.L.A. Schechter Poultry Corp. v. U.S.,*
  295 U.S. 495 (1935).................................................................25

*Alpine Securities Corp. v. FINRA,*
  121 F.4th 1314 (D.C. Cir. 2024) ...............13, 18, 19, 22, 26, 33, 34, 40-42, 46, 52

*Axon Enter., Inc. v. FTC,*
  598 U.S. 175 (2023)......................................................... 1, 16, 53, 54

*Birkelbach v. S.E.C.,*
  751 F.3d 472 (7th Cir. 2014) ...............................................21

*Blount v. SEC,*
  61 F.3d 938 (D.C. Cir. 1995) ......................................... 21, 23

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,*
  531 U.S. 288 (2001)................................................................49

*Buckley v. Valeo,*
  424 U.S. 1 (1976)...................................................... 43, 47

*Carter v. Carter Coal Co.,*
  298 U.S. 238 (1936).........................................................11, 17, 20, 25

*Casanova v. Ulibarri,*
  595 F.3d 1120 (10th Cir. 2010) .................................... 16, 39

*Collins v. Yellen,*
  141 S. Ct. 1761, (2021)........................................................48

*Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr.,*
  508 U.S. 602 (1993)........................................... 15, 51, 52, 54

*Consumers' Research v. F.C.C.,*
  109 F.4th 743 (2024)........................................... 19, 27, 31

*Dep't of Transp. v. Ass'n of Am. R.R.,*
  575 U.S. 43 (2015)........................................... 18, 25, 26

*Edmond v. United States,*
  520 U.S. 651 (1997)................................................................47

iv

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
590 U.S. 448 (2020) ........................................................................ 43, 48

*Free Enterprise Fund v. PCAOB*,
561 U.S. 477 (2010) ..................................... 14, 15, 41, 43, 44, 45, 50

*General Bond & Share Co. v. SEC.*,
39 F.3d 1451 (10th Cir. 1994) .................................................... 51

*Lebron v. National R.R. Passenger Corp.*,
513 U.S. 374 (1995) ................................................... 11, 18, 47, 49

*Lugar v. Edmonson Oil Co.*,
457 U.S. 922 (1982) ........................................................................ 22

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) ........................................................................ 48

*McDaniel v. Wells Fargo Investments, LLC*,
717 F.3d 668 .......................................................................... 21, 39

*National Ass'n of Securities Dealers, Inc. v. SEC*,
431 F.3d 803 (D.C. Cir. 2006) ................................................... 11, 22

*Nat'l Horsemen's Benevolent and Protective Ass'n v. Black ("Horsemen's I")*,
53 F.4th 869 (5th Cir. 2022) ................................... 12, 17, 18, 19, 25-30

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black ("Horsemen's II")*,
107 F.4th 415 (5th Cir. 2024) ................. 13, 22, 30, 32, 35, 36, 37, 39, 40, 42, 45

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
565 F.3d (10th Cir. 2009) ........................................................... 34

*Oklahoma v. United States*,
62 F.4th 221 (6th Cir. 2023) ................................... 26, 27, 29-32, 36, 37

*Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*,
559 F.3d (8th Cir. 2009) ............................................................ 4, 21, 38

*Pittson Co. v. United States*,
368 F.3d 385 (4th Cir. 2004) ...................................................... 18

*Pueblo of Jemez v. U.S.*,
790 F.3d 1143 .......................................................................... 17

*Rooms v. SEC.*,
444 F.3d 1208 (10th Cir. 2006) ................................................... 51

4924-3943-9184, v. 1

*SEC v. Jarkesy,*
    144 S.Ct. 2117 (June 27, 2024)......................................................... 14, 52

*SEC v. Lucia,*
    585 U.S. 237 (2018) ....................................... 14, 15, 43, 45, 46, 47, 52

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020)............................................................................ 22, 50

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ......................................................................... 16, 53, 54

*U.S. v. Rodriguez-Aguirre,*
    264 F.3d 1195 (10th Cir. 2001) ...............................................................17

*United States v. Ackerman*,
    831 F.3d 1292 (10th Cir. 2016) ...................................... 23, 45, 48, 49

*Valdez v. Nat'l Sec. Agency,*
    228 F. Supp. 3d 1271 (D. Utah 2017) ...................................................17

*West v. Atkins,*
    487 U.S. 42 (1988)..................................................................................22

*Whistler Invs., Inc. v. Depository Trust & Clearing Corp.,*
    539 F.3d 1159 (9th Cir. 2008) ....................................................... 21, 24

## **Statutes**

15 U.S.C. § 78b ................................................................................................20

15 U.S.C. § 78q-1(a) ...............................................................3, 5, 11, 20

15 U.S.C. § 78q-1(b) ...................................................................... 3, 22, 28

15 U.S.C. § 78s(b).......................................................................... 21, 28, 29

15 U.S.C. § 78s(c).......................................................................... 12, 28, 30

15 U.S.C. § 78s(d).................................................................. 9, 22, 28, 36, 37

15 U.S.C. § 78s(e).............................................................................. 36, 37, 38

15 U.S.C. § 78s(g)(1)(C) ............................................................. 22, 28, 39

15 U.S.C. § 78s(h)(1)........................................................................................41

15 U.S.C. § 78s(h)(4) ..................................................................... 41, 44

4924-3943-9184, v. 1

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

U.S. Const. art. II, § 1, cl. 1 ...............................................................42

U.S. Const. art. II, § 2, cl. 2 ..........................................................7, 43

## Rules

10th Cir. R. 28.2(c)(3) ..................................................................... viii

10th Cir. Rule 32 ................................................................................56

Fed. R. App. P. 32(a) .........................................................................56

Fed. R. App. P. 32(f) ..........................................................................56

Fed. R. Civ. P. 12(b)(1) ................................................................1, 17

Fed. R. Civ. P. 12(b)(6) ...........................................................1, 16, 17

## Regulations

17 C.F.R. § 201.900(a)(1)(iii), (a)(2) .................................................9

## Other Authorities

*In re Alpine Sec. Corp.,* SEC Release No. 100128 (May 14, 2024), Admin. Proc.
   File No. 3-21924 ...........................................................................9, 10

*In re Lek Sec. Corp.,*
   SEC Release No. 34-95104, 2022 WL 1769802 (May 31, 2022) ............. 9, 24, 38

*In re Lek Sec. Corp.,* Admin. Proc. No. 3-20808.....................................9

*Officers of the United States Within the Meaning of the Appointments Clause,*
   31 U.S. Op. O.L.C., 2007 WL 1405458 (Apr. 16, 2007).............................. 48, 49

*Notice of Filing and Immediate Effectiveness of Proposed Rule Change to Stay the
   Effectiveness of Specified Expulsions and FINRA Actions,* SEC Release No. 34-
   103228; SR-FINRA-2025-004 (June 11, 2025) ......................................... 13, 34

S. REP 94-75, 1975 U.S.C.C.A.N. 179 ...................................... 21, 39, 51

87 Fed. Reg. 53,796 (September 1, 2022) .................................................6

SEC Release No. 34-95618 (August 26, 2022) ........................................6

## PRIOR OR RELATED APPEALS

Pursuant to 10th Cir. R. 28.2(c)(3), Appellant Alpine Securities Corp. gives notice of the following prior, related appeal between these parties in this matter:

- *Alpine Securities Corp. v. National Securities Clearing Corporation, et al.,* Case No. 24-4027 (dismissed as moot April 10, 2025, 10th Cir. Dkt. No. 98).

## GLOSSARY OF ABBREVIATIONS

<u>Alpine</u>: Plaintiff/Appellant Alpine Securities Corporation

<u>CTA:</u> Cease to Act

<u>DTC</u>: Depository Trust Company

<u>DTCC:</u> Depository Trust & Clearing Corporation

<u>ENC:</u> Excess Net Capital

<u>FCC:</u> Federal Communications Commission

<u>FINRA</u>: Financial Industry Regulatory Authority

<u>FTC:</u> Federal Trade Commission

<u>HISA</u>: Horseracing Integrity & Safety Act

<u>NASD</u>: National Association of Securities Dealers

<u>NSCC</u>: National Securities Clearing Corporation

<u>PCAOB</u>: Public Company Accounting Oversight Board

<u>SEC</u>: Securities and Exchange Commission

<u>SRO</u>: Self-Regulatory Organization

4924-3943-9184, v. 1

# JURISDICTIONAL STATEMENT

In this case, Plaintiff/Appellant Alpine Securities Corporation ("**Alpine**") brings constitutional claims against Defendants/Appellees National Securities Clearing Corporation ("**NSCC**"), Depository Trust Company ("**DTC**") and Depository Trust & Clearing Corporation ("**DTCC**") (collectively, "**Clearing Agencies**"), challenging their structure and operations as unconstitutional in violation of the private nondelegation doctrine and/or Article II, including the "here and now" injury that flows from being subjected to an unconstitutional enforcement proceeding by an "illegitimate decisionmaker," i.e., a "Hearing Panel" consisting of three self-selected members of the Clearing Agencies' collective board of directors.[1] *See Axon Enter., Inc. v. FTC,* 598 U.S. 175, 191 (2023). The district court had subject matter jurisdiction over all of Alpine's constitutional claims under 28 U.S.C. § 1331. *Id.* at 185-196.

This Court has jurisdiction under 28 U.S.C. § 1291, because this appeal is from a final order and judgment granting the Clearing Agencies' motion to dismiss all of Alpine's claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), entered on March 25, 2025. Mem. Decision & Order Granting Defendant's Motion to Dismiss ("**Order**"), Appx.Vol.2:127-143 (Attach. A hereto); Judgment of

---

[1] Appx.Vol.1:14-55; Appx.Vol.2:06-33. Citations to the Appendix are hereafter referred to as "Appx." followed the volume and relevant page number in that volume of the appendix – *e.g.,* "Appx.Vol.X:XXX.

1

Dismissal ("**Judgment**"), Appx.Vol.2:144 (Attach. B hereto). Alpine filed a notice of appeal from the Order and Judgment on April 23, 2025. Appx.Vol.2:145-147.[2]

## STATEMENT OF ISSUES

1.      Whether the district court erred in concluding the Clearing Agencies are not subject to constitutional constraints when they exercise sweeping governmental powers to regulate and control access to the United States securities markets, pursue enforcement actions and impose sanctions that carry the force of federal law and can force the closure of a firm.[3]

2.      Whether, to the extent the Clearing Agencies are private entities, the district court erred in dismissing Alpine's claim for violation of the private nondelegation doctrine where the Clearing Agencies exercise government power without sufficient government oversight, including through the Clearing Agencies' ability to (a) commence investigations, conduct disciplinary proceedings, and impose disciplinary sanctions in their discretion and implement their decisions prior to review by the delegating agency; and (b) issue and implement rules that have the force of law and cannot be modified by the delegating agency.[4]

---

[2] The United States intervened for the Clearing Agencies on January 29, 2024, Dkt. 28. It is unknown whether the United States intends to participate in this appeal.

[3] This issue was preserved at Appx.Vol.1:15-23; Appx.Vol.2:06-09, 18-22; Order, at 7-16.

[4] This issue was preserved at Appx.Vol.1:15-23, 53-53; Appx.Vol.2:23-30; Order, at 12-16.

2

3.     Whether the multi-level protection from presidential removal and oversight enjoyed by the Clearing Agencies' collective Board of Directors ("**Board**"), including while serving on the Hearing Panel, and executive officers violates Article II.[5]

4.     Whether the method for appointing the Clearing Agencies' Hearing Panel, Board and executive officers violates the Appointments Clause.[6]

5.     Whether the district court erred in concluding it lacked subject matter jurisdiction over Alpine's claim for violation of due process.[7]

**STATEMENT OF THE CASE**

**1.  Overview of DTCC and its Subsidiaries**

In 1975, Congress added Section 17A to the Exchange Act to direct *the SEC* to "facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities." 15 U.S.C. § 78q-1(a)(2)(A)(i), (e). Section 17A also authorized *the SEC* to register and regulate clearing agencies. 15 U.S.C. § 78q-1(b). The SEC effectively outsourced its obligations to establish a national clearance and settlement system by redelegating

---

[5] This issue was preserved at Appx.Vol.1:15-23, 27-39, 49-50; Appx.Vol.2:12-22; Order, at 10-11.

[6] This issue was preserved at Appx.Vol.1:15-23, 51-52; Appx.Vol.2:12-22; Order at 10-11.

[7] This issue was preserved at Appx.Vol.1:21-22, 41-48, 53;  Appx.Vol.2:30-34; Order, at 6-10.

4924-3943-9184, v. 1

it to the Clearing Agencies as "registered clearing agencies." As a result of that delegation, a triumvirate of private corporate entities run by private corporate executives now control access to the securities markets. *See Pet Quarters, Inc. v. Depository Trust & Clearing Corp.,* 559 F.3d at 776-77 (8th Cir. 2009) (discussing registration and role of DTC and NSCC in the national market system). Appx.Vol.1:24-25, 27-30. DTCC, a Delaware corporation, is the parent entity and operates two subsidiaries, NSCC and DTC – both self-regulatory organization ("SROs"). Appx.Vol.1:23-25. NSCC provides centralized clearance and settlement and acts as the central counterparty between the buyer and seller in virtually every securities transaction. Appx.Vol.1:24. DTC is the nation's principal securities depository for the national markets, holding securities and accounting for the book-entry movements of securities from firm to firm. Appx.Vol.1:24. To clear and settle equity securities transaction in the United States, a firm must be a member of the Clearing Agencies. Appx.Vol.1:24-25, 28-29; *cf. also Pet Quarters,* 559 F.3d at 776-77 (describing organization and functions of NSCC, DTC and DTCC).

The entities are controlled and managed by common Boards of Directors ("**Board**") and executives. Appx.Vo1.1:23-25. Individuals elected to DTCC's Board are also elected to NSCC's and DTC's Boards, and the president and CEO of DTCC is also the president and CEO of NSCC and DTC. Appx.Vol.1:25.

4924-3943-9184, v. 1

As alleged in the Complaint, these Clearing Agencies have acquired a virtual monopoly and control over the right to access and participate in securities transactions in the United States – a quintessential governmental function *that Congress entrusted to the SEC.* 15 U.S.C. § 78q-1(a). Appx.Vol.1:15-18, 24-32.

## 2. The Clearing Agencies' Capital Requirements

Alpine's primary business for decades has been clearing sales of microcap or OTC stock transactions for itself and other firms, including an affiliated company, Scottsdale Capital Advisors ("**SCA**"). Appx.Vol.1:23. For the past several years, Alpine only cleared transactions for SCA. Appx.Vol.1:37. That also recently changed with the implementation of NSCC's new excess net capital (**"ENC"**) requirements, when Alpine decided to engage only in self-clearing. Appx.Vol.1:36-37. To operate its business as a self-clearing broker and provide clearing and settlement services for its customers, Alpine must be a member of NSCC, DTC and have access to their services. Appx.Vol.1:22, 25-26, 29, 38, 48.

NSCC imposes significant capital requirements for clearing and settling trades, establishing minimum deposit requirements (for Alpine $3 million), and margin deposit requirements on every trade to cover NSCC's purported risk that a member will default on its obligation.[8] Appx.Vol.Vol.1:33-36.

---

[8] The supposed risk that the enormous margin charges are designed to guard against does *not even exist* in relation to Alpine's transactions because Alpine engages only in sell-side transactions in which the stock is *already on deposit with DTC.* The

In addition, on October 26, 2023, NSCC began implementing a rule change imposing a 1000% increase in its ENC requirements: (a) from $500,000 to $5 million for self-clearing firms and (b) from $1 million to $10 million for firms that "clear for others."[9] Appx.Vol.1:35-36.

Faced with the 1000% increase in its capital requirements, Alpine decided to cease clearing for others and continue only as a self-clearing firm, including by terminating its clearing relationship with SCA. Appx.Vol.1:36-37. Alpine notified DTCC of that decision in September 2023 and provided formal notice on October 24, 2023. Appx.Vol.1:37-38.

DTCC nonetheless continued to demand that Alpine satisfy the $10 million ENC requirement applicable to firms that "clear for others," claiming it was still "evaluating" Alpine's self-clearing status. Appx.Vol.1:19-20, 37-38. Because of the monopolistic position occupied by NSCC and its threats to cease to process trades for Alpine and force the closure of its business, Alpine arranged to obtain an additional $6.4 million from its ownership to meet the $10 million ENC requirement. Those funds were transferred to Alpine on October 25, 2023 with the notation "paid

---

capital needed to fund these charges limits trading, even though there is *no risk* that Alpine will fail to deliver stock that is already in the hands of DTC. Appx.Vol.1:33-35.

[9] The new ENC rule was approved by the SEC with an effective date of August 26, 2023, but had a 60-day grace period for compliance. *See* SEC Release No. 34-95618 (August 26, 2022); 87 Fed. Reg. 53,796 (September 1, 2022).

in capital." Appx.Vol.1:19-21, 38. Alpine has maintained $10 million in ENC since that time, with the exception of a reported shortfall of $177,000 for a short period of time that was promptly remedied. Appx.Vol.1:48.

### 3. After Alpine Filed This Case, the Clearing Agencies Commenced a "Cease to Act" Proceeding Against Alpine

Alpine commenced this action on October 27, 2023, bringing four claims challenging the Clearing Agencies' unconstitutional exercise of significant government power : (1) violation of separation of powers, U.S. Const. art. II; (2) violation of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2; (3) unconstitutional delegation of government power to purportedly private entities; and (4) violation of due process. Appx.Vol.1:04 (Dkt.1), 14-55.[10]

Twelve days later – on November 9, 2023 – the Clearing Agencies took action against Alpine by commencing a cease-to-act ("**CTA**") proceeding, issuing a "Notice of Intent to Cease to Act" for Alpine. Appx.Vol.1:45-46. In the Notice, the Clearing Agencies claimed they had "determined to cease to act for Alpine," and terminate Alpine's membership, "subject to Alpine's right to a hearing," because Alpine had purportedly not complied with the new ENC requirements and had submitted inaccurate ENC data. Appx.Vol.1:45-46.

---

[10] Alpine filed its Amended Complaint on February 21, 2024. Appx.Vo1.1:14-55.

Alpine heard nothing further regarding a hearing for almost two months until January 19, 2024. Appx.Vol.1:46. At that point, Alpine learned exactly what a "right to hearing" meant in the Clearing Agencies' unconstitutional system: DTCC advised that it had selected three members of Clearing Agencies' collective Board to serve as the purported "Hearing Panel" to review the CTA determination that had already been made by the Clearing Agencies' management *and approved by their Board*. Appx.Vol.1:42-44, 46-47. Unlike the SEC and FINRA, the Clearing Agencies do not even have hearing officers who could claim to be independent of the integrated organization, or give even the appearance of impartiality. Appx.Vol.1:46-47.

Unsurprisingly, the Hearing Panel thereafter denied Alpine's requests for discovery regarding, *inter alia,* the basis for the CTA "determination." Appx.Vol.1:46-47. They also determined that the scope of the hearing would be limited to whether the Clearing Agencies' determinations set forth in the Notice were "consistent with" *NSCC's and DTC's own rules*, and whether their determination to impose the harshest sanction was "properly imposed" under their own rules. Appx.Vol.1:46-47.

On February 12, 2024, notwithstanding issues concerning the availability of Alpine's witnesses, the Hearing Panel set the 3-day hearing to commence in New York on March 18, 2024. Appx.Vol.1:47.

4924-3943-9184, v. 1

The CTA proceeding occurred on March 18, 19 and 27, 2024. Appx.Vol.2:10-11. On April 25, 2024, DTCC issued a decision that confirmed NSCC's and DTC's immediately effective decision to cease to act for Alpine and terminate its membership. Appx.Vol.1:47; Vol.2:10-11.[11] Alpine sought review of the April 25, 2024, CTA decision by the SEC pursuant to 15 U.S.C. § 78s(d), and a stay of the decision pending review. Appx.Vol.2:10-11. On May 14, 2024, the SEC granted an administrative stay pending its decision on Alpine's motion to stay. *Id.* There is no set date by which the SEC would rule on the motion for a stay, let alone the merits. *Id.*[12]

### 4. Relevant Proceedings Before the District Court and Prior Appeal

On February 20, 2024, Alpine filed a motion for a preliminary injunction ("**Injunction Motion**"), seeking to enjoin the CTA proceeding to allow Alpine's

---

[11] *In re Alpine Sec. Corp.,* SEC Release No. 100128 (May 14, 2024), Admin. Proc. File No. 3-21924, available at: https://www.sec.gov/files/litigation/opinions/2024/34-100128.pdf.

[12] The SEC has issued non-binding "guidelines" indicating it will try to issue a decision on an appeal in eight to ten months. 17 C.F.R. § 201.900(a)(1)(iii), (a)(2). But, in the only other SEC proceeding to review a CTA determination by the Clearing Agencies, the SEC has granted itself **nine** 90-day extensions to issue a decision. *In re Lek Sec. Corp.,* Admin. Proc. No. 3-20808, https://www.sec.gov/litigation/apdocuments/3-20808. Thus, while Lek Securities filed its petition for SEC review in April of 2022, it remains pending before the SEC without a decision over three years later, during which period the Clearing Agencies have ceased to act for Lek and, as a result, "Lek could no longer operate as a self-clearing broker." *In re Lek Sec. Corp.,* SEC Release No. 34-95104, 2022 WL 1769802 at *1 (May 31, 2022).

constitutional arguments to be considered on the merits. Appx.Vo1.1:9 (Dkt. 33). The district court denied Alpine's Injunction Motion on March 8, 2024. Appx.Vol.1:56-74.

On March 8, 2024, Alpine appealed to this Court from the order denying the motion for preliminary injunction, which became *Alpine v. National Securities Clearing Corp., et al.,* Tenth Circuit Case No. 24-4027 (the "**Prior Appeal**"). Appx.Vol.1:10-11 (Dkt. 52, 54). Although the Prior Appeal was fully briefed and argued, this Court never issued a decision on the merits.[13]

While the Prior Appeal was pending, the Clearing Agencies filed a motion to dismiss Alpine's amended complaint. Appx.Vol.1:75-200. On March 25, 2025, the district court entered its Order and Judgment granting the Clearing Agencies' motion to dismiss all of Alpine's claims, without oral argument. Order, (Attach. A hereto).[14]

The district court concluded that the Clearing Agencies' exercise of government power did not violate the private nondelegation doctrine as a matter of law, deciding that the Clearing Agencies function subordinately to the SEC. Order, at 12-16. The district court also dismissed Alpine's claims under Article II for violation of separation of powers and the Appointments Clause on the basis that,

---

[13] *See* Prior Appeal, Case No. 24-4027, Tenth Circuit Dkt. 56-57, 60, 62, 77, 92.

[14] As a result of the district court's Order dismissing Alpine's amended complaint, this Court dismissed Alpine's Prior Appeal as moot on April 10, 2025, without deciding the issues on their merits. Prior Appeal, Case No. 24-4027, Dkt. No. 98.

4924-3943-9184, v. 1

regardless of the extent of government power that Clearing Agencies wield, Alpine failed to establish they qualified as "governmental entities" under the narrow framework of *Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374 (1995). Order, at 10-11. Finally, the district court dismissed Alpine's due process claim for lack of subject matter jurisdiction. Order, at 6-9.

## SUMMARY OF THE ARGUMENT

The power to regulate access to the securities markets, including to establish and regulate a national market system for clearing and settlement of securities transactions, is a significant executive power that Congress conferred on the SEC. *See* 15 U.S.C. §§ 78q-1(a), 78b. The SEC delegated that power to the Clearing Agencies, nominally private corporations, that control access to the United States' securities markets through regulation and enforcement of their rules. They are exercising delegated power that "ultimately belongs to the SEC." *National Ass'n of Securities Dealers, Inc. v. SEC*, 431 F.3d 803, 806 (D.C. Cir. 2006) ("*NASD*"). That exercise of executive power by purportedly private entities implicates fundamental constitutional concerns including both the private nondelegation doctrine and the need for adherence to Constitutional requisites.

1.    *Private Nondelegation Doctrine.* The threshold question is whether the grant of such power contravenes the private nondelegation doctrine, which prohibits conferral of "federal power" on a private entity – "an intolerable and unconstitutional

interference with personal liberty and private property." *E.g., Carter v. Carter Coal Co.,* 298 U.S. 238, 311 (1936). It is considered permissible only where the private entity is truly subordinate to the government agency, acting only in a ministerial or advisory role. It is plainly prohibited where, as here, the private entities engage in front-line regulating and enforcement.

The Clearing Agencies regulate by drafting and implementing rules that have the status of federal law once they are approved, which the SEC lacks the power to modify. 15 U.S.C. § 78s(c). Contrary to the district court's conclusion here, such regulatory authority violates the private nondelegation doctrine because it is not ministerial, and it is not sufficiently overseen by the delegating agency. *See Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869, 885-890 (5th Cir. 2022) ("*Horsemen's I*").

More critically, the Clearing Agencies exercise the quintessentially executive power to *enforce* their rules – in their discretion and without pre-approval by the SEC – through investigation and charging of alleged violations, and by presiding over disciplinary actions, through a Hearing Panel comprised of members of their own Board, that lacks any semblance of impartiality or other due process requirements, in which they can impose a final, self-executing and draconian disciplinary sanction. The Clearing Agencies used each of these unchecked enforcement powers against Alpine, including imposing the immediately effective

CTA sanction that will prevent Alpine from operating as a self-clearing broker, and force the closure of its business, as soon as it is implemented.

At least two Circuits have held that it is unconstitutional for private entities to wield such unchecked executive power. The D.C. Circuit held that FINRA's imposition of an expulsion order that was effective *prior to* any SEC review on the merits violated the private nondelegation doctrine. *Alpine Securities Corp. v. FINRA,* 121 F.4th 1314, 1324 (D.C. Cir. 2024). Notably, FINRA has since proposed to change its rules to comply with that D.C. Circuit decision so that the type of expulsion sanction at issue in *Alpine v. FINRA*, would *not* become effective until the time for seeking SEC review has expired or the SEC completes its review on the merits (*see fn.* 17, *infra*).

The Fifth Circuit has held that a private entity that can wield the "quintessentially executive" powers to investigate, prosecute, and punish "all without the say-so of the agenc*y*—does not operate under that agency's authority and surveillance," and that this cannot be cured by the agency's after-the-fact review of a sanction. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, (*"Horsemen's II"*), 107 F.4th 415, 428-430 (5th Cir. 2024).

This district court reached a conclusion contrary to that of the Fifth and D.C. Circuits, holding that the possibility of after-the-fact SEC review cures any constitutional problem. Order, at 13, 16. That holding ignores the reality of the

unsupervised executive actions that can be taken by the Clearing Agencies without the SEC's say-so before any review and should be rejected.

2.      *Article II.* Those who wield "significant authority" of the executive branch are engaged in state action and so must comply with the Constitution. *See, e.g., SEC v. Lucia,* 585 U.S. 237, 245 (2018). This includes putatively private entities who wield executive power. To ensure political accountability, the Clearing Agencies' collective Board and officers, especially when serving as a Hearing Panel, must be appointed by an appropriate governmental officer, *id.* at 247, and removable by the president under Article II. *Free Enterprise Fund v. PCAOB,* 561 U.S. 477, 514 (2010). Their exercise of federal power must also comport with all other constitutional protections, including the Fifth and Seventh Amendments. *SEC v. Jarkesy,* 144 S.Ct. 2117, 2139, 2145 (June 27, 2024). What follows logically from these authorities is a commonsense and essential principle: Government power cannot, through delegation to purportedly "private entities," be stripped of the critical constraints embedded in the Constitution to protect those that are subject to that power.

The Clearing Agencies' structure satisfies none of these requirements despite wielding significant executive authority. The district court's conclusion that this does not matter because the Clearing Agencies were not created or funded by the government is incorrect. Under Supreme Court precedent, it is not the label that controls the inquiry; the test is whether the actor exercises significant executive

authority. *See, e.g., Lucia,* 585 U.S. at 245. Nor does the district court's conclusion make sense. The Clearing Agencies' Hearing Panel alone exercises "significant discretion" and adjudicatory/sanctioning powers that are indistinguishable from SEC's administrative law judges ("**ALJs**") determined to be "Officers of the United States" in *Lucia,* 585 U.S. at 248-251. It makes no sense to treat the Hearing Panel differently. Similarly, the Clearing Agencies' Board and executives have dual-level protection from removal by the president, exactly like the PCAOB, which the Supreme Court found unconstitutional in *Free Enterprise.* 561 U.S. at 482.

In short, the district court accepted and memorialized a constitutional loophole: governmental power can be outsourced to a private entity that can disclaim any obligation to abide by the Constitution. This was error.

3.     *Due Process.* The district court also erred in concluding it lacked jurisdiction over Alpine's claim that the Clearing Agencies' expedited CTA hearing is so biased and unfair it violates due process. Even private entities must provide due process, and failure to provide a "neutral and detached judge" violates due process and cannot be remedied on appeal. *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 617 (1993). Adjudicating the ability of Alpine to engage in the clearing business via a Hearing Panel comprised of three members of the Clearing Agencies' collective Board – an inherently biased body – violates this most basic due process protection.

The district court's conclusion that Alpine must first present this claim through the SEC's administrative review process is at odds with *Axon Enter., Inc. v. FTC,* 598 U.S. 175 (2023), which held that the review scheme of the Exchange Act does not displace federal question jurisdiction to review claims that an entity is "wielding authority unconstitutionally," *id.* at 189, including by subjecting parties "to an illegitimate proceeding, led by an illegitimate decision maker." *Id.* at 191. That is this case: the CTA proceeding is an unconstitutional exercise of executive authority, led by a Hearing Panel that is an illegitimate decision maker. Moreover, even if *Axon* were somehow not applicable, the factors from *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200 (1994) are not met because the SEC has no special expertise to resolve constitutional questions, and because the lack of a neutral arbiter cannot be remedied on appeal.

## STANDARD OF REVIEW

The district court dismissed Alpine's claims for violation of the private nondelegation doctrine and Article II under Rule 12(b)(6). "'The legal sufficiency of the complaint is a question of law, and a Rule 12(b)(6) dismissal is reviewed de novo.'" *Casanova v. Ulibarri,* 595 F.3d 1120, 1124 (10th Cir. 2010) (citation omitted). "Courts must evaluate whether the complaint contains 'enough facts to state a claim for relief that is plausible on its face,'" and "'accept as true all well

pleaded factual allegations … and view these allegations in the light most favorable to the plaintiff.'" *Id.* at 1124-25 (citations omitted).

The same standard applies to the dismissal of Alpine's due process claim for lack of subject matter jurisdiction under Rule 12(b)(1), because it was based on a "facial challenge [that] focused exclusively on the sufficiency of the allegations in Plaintiffs' Amended Complaint, without reference to declarations, affidavits, or other evidence." *Valdez v. Nat'l Sec. Agency,* 228 F. Supp. 3d 1271, 1279 (D. Utah 2017) (*citing U.S. v. Rodriguez-Aguirre,* 264 F.3d 1195, 1203 (10th Cir. 2001)). Alpine is thus afforded similar safeguards to those provided in opposing a Rule 12(b)(6) motion, and this Court's review is "de novo." *Pueblo of Jemez v. U.S.,* 790 F.3d 1143, 1147-48 *and* n.4 (10th Cir. 2015).

## ARGUMENT

The irrefutable fact at the heart of this case is that the Clearing Agencies exercise governmental powers to regulate access to trading in the United States securities markets – power that was delegated by Congress to the SEC and then outsourced to the Clearing Agencies. The fundamental question facing this Court is whether this conferral of enormous governmental power to purportedly *private entities,* which flies in the face of established constitutional law, is permissible. As was expressly held by the Supreme Court decades ago in *Carter Coal,* 298 U.S. at 311, and recently emphasized in *Horsemen's I*: "Our Constitution permits only the

federal government to exercise federal power." 53 F.4th at 880. Even then, federal power may only be exercised within defined lanes: "core government power must be exercised by the Department on which it is conferred and must not be delegated to others in a manner that frustrates constitutional design." *Pittson Co. v. United States,* 368 F.3d 385, 394 (4th Cir. 2004).

And for good reason. Our Constitution intertwined the grant of governmental power with constraints on that power to protect the citizenry from abuse of that power. Excising the powers from those constraints not only permits but invites that abuse. As Judge Walker aptly observed in *Alpine v. FINRA*, "private citizens cannot wield significant executive authority" because "if the vast powers of the federal government could be exercised outside the constitutional system, the government would be 'able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form.'" 121 F.4th at 1343 (Judge Walker, *concurring and dissenting in part*) (quoting *Lebron v. Nat'l Railroad Passenger Corp.,* 513 U.S. 374, 397 (1995)).

"When it comes to private entities…there is not even a fig leaf of constitutional justification" for delegation. *U.S. Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 61 (2015) ("*Amtrak II*") (Alito, J. concurring). This prohibition protects the "vital constitutional principle" that "liberty requires *accountability*." *Id.* (emphasis added). "If it were otherwise – if people outside the government could

wield the government's power – the government's promised accountability to the people would be an illusion." *Horsemen's I,* 53 F.4th at 880 (citing authorities); *accord Consumers' Research v. F.C.C.,* 109 F.4th 743, 775 (2024) (same).

As these and other decisions illustrate, the Supreme Court and several Circuits have recently begun to take a hard look at the exercise of federal power to ensure it complies with constitutional requirements and design, including that federal power is being wielded by a constitutionally appropriate actor. The district court here, however, gave short shrift to Alpine's claims. It did not dispute that the Clearing Agencies are exercising executive power without adherence to the Constitution, but it acceded to that circumstance, using high-level concepts to dismiss Alpine's constitutional claims out of hand and with little analysis. For instance, it cited the SEC's general oversight authority over SROs to conclude there was no unconstitutional delegation of government power to the putatively private Clearing Agencies, Order at 13, 16, even while it disregarded the non-ministerial ability of the Clearing Agencies to pursue enforcement activities against Alpine and deny it access to the markets without the SEC's say-so and prior to agency review – the precise circumstance found by the D.C. Circuit in *Alpine v. FINRA* to run afoul of the private nondelegation doctrine, 121 F.4th at 1324. And, it concluded that Article II was inapplicable because the Clearing Agencies do not qualify as "governmental entities" since they were not created or funded by the government for a government

purpose, Order, at 10-11, even though they unquestionably exercise significant government power. The district court's decision to give the Clearing Agencies a free pass around the Constitution does not hold up to scrutiny.

## I. The Clearing Agencies Exercise Federal Power Through Their Regulatory and Enforcement Functions.

There is little question that the Clearing Agencies, while nominally private entities, are exercising governmental regulatory and enforcement authority. The power to regulate access to the securities markets is an enormous and impactful governmental power that Congress conferred on the SEC. *See* 15 U.S.C. §§ 78q-1(a), 78b.[15] It does not lose its character as a government function simply because the SEC chose to re-delegate it to the Clearing Agencies. *See Carter Coal,* 298 U.S. at 311 (The "power to regulate" is "necessarily a government function" because "in the very nature of things, one person may not be intrusted [*sic*] with the power to regulate the business of another[.]"); *Consumer's Research,* 109 F.4th at 770-771 (holding the FCC "delegated government power" when it granted a private entity the authority to determine the amount of money telecommunication carriers must contribute to fund an agency's universal service program).

---

[15] *See* 15 U.S.C. § 78q-1(a) (directing the SEC to establish "national system for the prompt and accurate clearance and settlement of transactions in securities"); 15 U.S.C. § 78b (recognizing that "transactions in securities" conducted in national securities markets "are effected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto").

4924-3943-9184, v. 1

In fact, in amending the Exchange Act in 1975 – the very amendments that authorized registered clearing agencies – Congress unequivocally recognized that the Clearing Agencies would be exercising *government power*:

> **The self-regulatory organizations exercise government power**, and they do so in basically three ways which may adversely affect the interests of particular persons: (1) by imposing a disciplinary sanction, broadly defined, on a member or person affiliated with a member, (2) by denying membership to an applicant, and (3) by requiring members to cease doing business entirely or in specified ways with a particular non-member or with respect to a particular security…. **The self-regulatory organizations must exercise governmental-type powers if they are to carry out their responsibilities under the Exchange Act.**

S. REP. 94-75, at 24, 1975 U.S.C.C.A.N. 179 (emphasis added).

The activities of the Clearing Agencies are so entwined with governmental prerogatives that the rules the Clearing Agencies create and enforce have the status of federal law to the point that they preempt contrary state law. *Whistler Invs., Inc. v. Depository Trust & Clearing Corp.,* 539 F.3d 1159, 1164 n.2, 1168 (9th Cir. 2008); *Pet Quarters, Inc.,* 559 F.3d at 779-82. Courts have likewise recognized that the rules of FINRA, a similarly-situated SRO, "operate[] . . . as federal law[.]" *Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995); *accord McDaniel v. Wells Fargo Investments, LLC,* 717 F.3d 668, 673 *and* n.6 (9ᵗʰ Cir. 2013) (observing that Congress has vested SROs "with the power to promulgate rules that, once adopted by the SEC, have the force of law" under 15 U.S.C. § 78s(b), and "*[f]or that reason*, SRO rules are capable of preempting state law." (emphasis added) (citing *Whistler,*

21

539 F.3d at 1168)); *Birkelbach v. S.E.C.*, 751 F.3d 472, 475 n.2 (7th Cir. 2014) (FINRA's rules carry the force of law); *Alpine v. FINRA,* 121 F.4th at 1339-40 (Walker, J., *concurring and dissenting in part*) (observing that FINRA "functions in ways similar to a governmental agency" because it has "the power to promulgate rules that carry 'the force of law' upon SEC approval," in addition to acting "in an 'adjudicatory and prosecutorial capacity'") (citations omitted)).

The rules of purely private entities do not operate as federal law to preempt state law. That authority exists only where an entity has been delegated executive power that "ultimately belongs to the SEC," *NASD,* 431 F.3d at 806, and whose actions are thus "fairly attributable to the State." *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 937 (1982)*; see also West v. Atkins,* 487 U.S. 42, 55-56 (1988) (state action exists where the state delegates its authority to a private actor). More precisely, that executive power "belongs to the President alone." *Seila Law LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197, 213 (2020).

Most critical here is that the Clearing Agencies also have the power to enforce their own rules through investigation, disciplinary actions and sanctions that can immediately *and without agency review* force the closure of a business. *See* 15 U.S.C. §§ 78s(d)-(f), 78s(g)(1), 78q-1(b)(3)(g)-(h). The powers to investigate, prosecute and punish "are all quintessentially executive functions," and "they have been considered so from our Nation's founding." *Horsemen's II,* 107 F.4th at 428

*and* fns. 9-10 (citing cases); *see also Alpine v. FINRA,* 121 F.4th at 1325 (describing FINRA's authority to take disciplinary actions against its members, including to bar them from the industry, as a "delegation of government authority"). The law is no different in this Circuit. *See United States v. Ackerman*, 831 F.3d 1292, 1296 (10th Cir. 2016) ("[W]hen an actor is endowed with law enforcement powers beyond those enjoyed by private citizens, courts have traditionally found the exercise of the police power engaged.").

The D.C. Circuit's decision in in *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995), provides further support. The Court held there that the Municipal Securities Rulemaking Board (MSRB) engaged in government action. *Id.* at 941. The Court focused on two critical facts of relevance here: (1) the body's power over participation in the industry; and (2) the body's authority to issue rules that members can be expelled from the industry for violating. *Id.* A "broker or dealer may not engage in interstate trade in municipal securities unless he registers" with the MSRB under the Exchange Act. *Id.* And "[i]f he violates an MSRB rule, he may be sanctioned by revocation or suspension of his license to deal in municipal securities." *Id.* The Court was clear: "As a government-enforced condition to any participation in a municipal securities career, [the MSRB's action] constitutes *government action of the purest sort*." *Id.* (emphasis added).

The entire CTA proceeding against Alpine is a vivid and extreme deployment

of executive power, a death knell for the firm and an enormous impediment for its customers. Alpine cannot process its customers' trades or operate its business as a self-clearing broker without membership in NSCC and DTC. Appx.Vol.1:22, 25-26, 29, 38, 48. The SEC has itself recognized membership in the Clearing Agencies is necessary to operate a "self-clearing broker" and that a CTA determination constitutes "irreparable harm."[16] Worse, the Clearing Agencies have decided it is somehow appropriate to have that exercise of executive power subject to supposed review by a Hearing Panel comprised of *their own Board*, Appx.Vol.1:22-23, 46, in violation of any concept of due process. *See* Section IV, *infra.* As in *Blount,* the Clearing Agencies engage in "government action" because they execute "a *government-enforced* condition to any participation in a . . . securities career." *Id.* (emphasis added). This is "government action of the purest sort." *Id*. And, no less than the MSRB's rules, the Clearing Agencies' rules have the status of federal law. *See Whistler,* 539 F.3d at 1164 n.2, 1168.

## II.    Alpine Has Stated a Valid Claim that the Clearing Agencies Violate the Private Nondelegation Doctrine By Wielding Federal Power.

Given the breadth of executive power being wielded by the Clearing Agencies, this Court must first decide whether the delegation of such power to a

---

[16] *See In re Lek Sec. Corp.,* SEC Release No. 34-95104, 2022 WL 1769802 at **1, 8 (May 31, 2022) (a CTA determination by the Clearing Agencies means that a broker-dealer "could no longer operate as a self-clearing broker," and causes "irreparable harm").

nominally private entity violates the private nondelegation doctrine. This appears to be an issue of first impression in this Circuit.

Analysis of that issue begins with the clear and well-established principle that delegations of federal authority to private parties are per se unconstitutional. *Amtrak II*, 575 U.S. at 62 (Alito, J., concurring) ("When it comes to private entities … there is not even a fig leaf of constitutional justification" for delegation); *Carter Coal,* 298 U.S. at 311 (delegating "the power to regulate" to a private party "undertakes an intolerable and unconstitutional interference with personal liberty and private property."). "'[I]f people outside government could wield the government's power— then the government's promised accountability to the people would be an illusion…. This commonsense principle has come to be known as the private non-delegation doctrine.'" *Horsemen's I,* 53 F.4th at 880 (citation omitted).

Given its constitutional repugnancy, the Supreme Court has "set its face against giving public power to private bodies." *Horsemen's I,* 53 F.4th at 880. The Supreme Court has called conferring governmental power on private persons "delegation in its most obnoxious form; for it is not even delegation to an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter Coal,* 298 U.S. at 311; *accord A.L.A. Schechter Poultry Corp. v. U.S.,* 295 U.S. 495, 537 (1935) (observing, even with a requirement for Presidential approval, a delegation of

"legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise or beneficent" for their industries is "unknown to our law and is utterly inconsistent with the constitutional prerogatives …."); *Amtrack II,* 575 U.S. at 62 (Alito, J. concurring) (*supra*).

Delegation to a private entity is not constitutional where, as here, the private entity does not function "subordinate[ly]" to the agency – in a "ministerial" or "advisor[y]" role. *E.g., Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023); *Horsemen's I,* 53 F.4th at 881 (same); *Alpine v. FINRA,* 121 F.4th at 1325 ("For a delegation of governmental authority to be a private entity to be constitutional, the private entity must act only 'as an aid' to an accountable government agency that retains the ultimate authority to 'approve[], disapprove[], or modif[y] the private entities actions and decisions on delegated matters." (citation omitted)). There is a critical line between what private entities may do in terms of providing advice or ministerial functions, and what constitutes an impermissible grant of governmental power to such an entity:

> Private entities may serve as advisors that propose regulations. And they may undertake ministerial functions, such as fee collection. ***But a private entity may not be the principal decisionmaker in the use of federal power***, may not create federal law, may not wield equal power with a federal agency, or regulate unilaterally.

*Oklahoma,* 62 F.4th at 229 (cleaned up) (emphasis added); *see also Consumers'*
*Research,* 109 F.4th at 773 ("'A ministerial duty … is one in respect to which **nothing**
**is left to discretion**.'" (citation omitted) (emphasis added)).

The district court here agreed that a delegation of power is permissible only if
the private entity is *subordinate* to the agency. Order, at 13, 16. But the district court
greatly oversimplified the issue by looking only to whether the Clearing Agencies
are *generally* subject to "SEC oversight." *Id.* More specifically, the district court
incorrectly concluded as a matter of law that the SEC's general oversight and the
opportunity for after-the-fact review can excuse a broad and unconstitutional
discretionary authority the Clearing Agencies have been granted on the front end to
control access to the nation's securities markets through both regulation and
enforcement without sufficient agency oversight. The Clearing Agencies do not act
in a merely advisory or ministerial capacity to the SEC in either their regulatory or
enforcement activities, but rather as "the principal decisionmaker[s] in the use of
federal power." *Oklahoma,* 62 F.4th at 229. This is unconstitutional.

## A. The Clearing Agencies' Regulatory Actions Violate the Private Nondelegation Doctrine.

The district court first erred in concluding that, because the SEC must approve
the Clearing Agencies' rules, they were sufficiently subordinate to pass
constitutional muster. Order, at 14. The Fifth Circuit's decision in *Horsemen's I,*
which held that the Horseracing Integrity and Safety Act ("HISA") was

27

unconstitutional under the private nondelegation doctrine, reached the opposite conclusion. 53 F.4th at 890. HISA granted "sweeping" rulemaking and enforcement authority over the horseracing industry to a private entity (the "Authority"), subject to oversight by the Federal Trade Commission ("FTC"). *Id.* at 872-74. Under HISA, the Authority was granted the power to draft regulations to create programs, but which take effect only upon review and approval by the FTC. *Id.* at 884. The FTC reviewed the proposed rules for "consistency" with HISA and prior rules – a similar structure, the Court observed, to the "SEC-FINRA model" under the Maloney Act, 15 U.S.C. § 78s(b). *Id.* 884, 887.

The Fifth Circuit found this "consistency" review to be insufficient to ensure the Authority "functions subordinately to the agency." *Id.* at 885.

> Saying a rule is or is not "consistent" with that standard says next to nothing. Such high-altitude oversight … "largely gives the Authority the power to 'fill up the details' of the Act in places with less specific directives," and "[f]illing up the details has long been recognized as the very business of regulating."

*Id.* (citations omitted).

More troubling to the Circuit was that the FTC lacked the power to modify the Authority rules after they are approved. *Id.* at 887. The Circuit held that this was a "key distinction" from the Maloney Act, which "empowers the SEC to 'abrogate, add to, and delete from' FINRA rules 'as the SEC deems necessary and appropriate.'" *Id.* at 887 (quoting 15 U.S.C. § 78s(c)). "Because we are considering

28

whether a private entity is subordinate to the agency for rulemaking purposes, that distinction makes all the difference." *Id.* at 888.

The Sixth Circuit agreed that the power to modify rules was essential when it reviewed a private nondelegation challenge to an amended version of HISA that gave the FTC the power to "'abrogate, add to, and modify the rules,' as it "deems necessary or appropriate.'" *Oklahoma,* 62 F.4th at 230. The Sixth Circuit found the addition of the modification power to be a "critically" important amendment that gave the FTC "true oversight authority." *Id.* (with the "broad power to write and ***rewrite*** rules comes policymaking discretion." (emphasis added)). The Sixth Circuit relied on this amendment to distinguish *Horsemen's I. See id.* ("With its new ability to have 'the final word on the substance of the rules,' the FTC bears ultimate responsibility." (citing *Horsemen's I*, 53 F.4th 886-887)).

Applying these principles here establishes that the Clearing Agencies are not sufficiently subordinate to the SEC. It is the Clearing Agencies – not the agency – that draft the rules and, like the FTC under the *pre-amendment* version of HISA at issue in *Horsemen's I,* the SEC only engages in "consistency" review of those proposed rules – i.e., the SEC must approve a proposed rule if it is "consistent with the requirements of this chapter [the Exchange Act] and the rules and regulations under this chapter." 15 U.S.C. § 78s(b)(2)(C).

Even more critical, unlike other SROs, the SEC lacks the essential power to modify the Clearing Agencies' rules. *See* 15 U.S.C. § 78s(c) ("The Commission, by rule, may abrogate, add to, and delete from ... the rules of a self-regulatory organization (***other than a registered clearing agency***) as the Commission deems necessary or appropriate …." (emphasis added)). The lack of modification power makes "all the difference," *Horsemen's I,* 53 F.4th 888, and deprives the SEC of the "true oversight authority" necessary to make the Clearing Agencies sufficiently subordinate to the agency to pass constitutional muster. *Oklahoma,* 62 F.4th at 230; *see also Horsemen's II,* 107 F.4th at 426 (the power to modify rules gives the agency "ultimate say on what the [private party's] rules are").

The SEC's inability to modify the Clearing Agencies' rules also takes on added significance to the subordination inquiry because the SEC plays no role in the Clearing Agencies' day-to-day implementation of their rules. NSCC's ENC rule illustrates the problem, because it provides no parameters for obtaining self-clearing status, leaving the Clearing Agencies free to take the position – *in their discretion* – that Alpine "clears for others," rather than engages in "self-clearing," in subjecting Alpine to a higher $10 million ENC requirement. Appx.Vol.1:32-38; Appx.Vol.2:27-28. Similarly, the SEC provides no direction or preapproval before NSCC calculates and imposes significant margin charges on trading activity. *Id.* These are just some examples of the Clearing Agencies' assertion of discretion that

improperly makes them "the principal decisionmaker in the use of federal power." *Oklahoma,* 62 F.4th at 229.

In *Consumers' Research,* in upholding a private delegation challenge, the Fifth Circuit rejected an argument that the private party acted in a mere "ministerial" capacity when it determined the amount of money to set aside to execute a government policy because "[t]he decision of how much money should be set aside to execute [the agency's] … policies – the very decision [the agency] has delegated to [the private party] – is an independent decision that requires independent judgment" and "discretion." 109 F.4th at 773.

So it is here. The SEC permits the Clearing Agencies to use their "independent judgment" to make "independent decision[s]" to implement their rules, including how to interpret what membership class applies to a member (and thus its ENC requirement) and how much margin to collect for trading. The SEC lacks the power to unilaterally modify these rules, and it is no answer to say that the Clearing Agencies' interpretations of a rule may be subject to review by the SEC down-the-road in an appeal proceeding because it does not cure the unconstitutional delegation of regulatory power to the Clearing Agencies in the first place.

The district court did not engage with these issues; it did not reference the Fifth and Sixth Circuits' analysis in *Horsemen's I* and *Oklahoma,* or address the impact of the SEC's limited, high-level consistency review before approving a rule,

the SEC's inability to modify the Clearing Agencies' rules, or the Clearing Agencies' discretion in implementing their rules. *See* Order, at 13-16. Instead, it concluded that the Clearing Agencies' regulatory activity is sufficiently subordinate to the SEC to pass constitutional muster solely because the SEC must approve the Clearing Agencies' rules before they go into effect. Order, at 13. This Court should follow the Fifth and Sixth Circuit's well-reasoned analyses, and reverse.

### B. The Clearing Agencies' Enforcement Powers Violate the Private Nondelegation Doctrine.

The impermissible extent of the Clearing Agencies' authority is even more evident in relation to their exercise of their "quintessentially executive" enforcement powers to investigate, prosecute and punish alleged violators of their rules. *Horsemen's II,* 107 F.4th at 428. The same principles that require agency approval of private-entity rules *before they become effective*, and ongoing oversight of the implementation of those rules by the private entity, also apply to a private entity's adjudication. *Id.* ("As much as legislative power, the private nondelegation doctrine forbids unaccountable delegations of executive power" to private parties); *accord Oklahoma,* 62 F.4th at 231.

The district court recognized that the "'private nondelegation doctrine forbids unaccountable delegations of executive power,'" and this can include disciplinary proceedings and other exercises of enforcement power by a private entity. Order, at 14 (quoting *Horseman's II,* 107 F.4th at 428). However, it concluded that the SEC's

ability to review the Clearing Agencies' adjudicatory actions and disciplinary proceedings after-the-fact was sufficient oversight to avoid any private nondelegation problem. Order, at 13, 16.

Respectfully, the district court got it wrong. The fact that the SEC has the ability to review the Clearing Agencies *final* disciplinary actions after-the-fact, or grant a discretionary stay of a final sanction, does not make the Clearing Agencies' enforcement powers subordinate to the agency because they are empowered to exercise the full panoply of their enforcement powers and force the closure of a business without the SEC's say-so.

The recent decisions from the D.C. Circuit in *Alpine v. FINRA* and the Fifth Circuit in *Horsemen's II* support that conclusion. In *Alpine v. FINRA,* which arose on appeal from a denial of preliminary injunction to stop an expedited enforcement proceeding against Alpine for violation of FINRA's rules, the D.C. Circuit held that Alpine was substantially likely to succeed on "its private nondelegation claim to the extent that FINRA can unilaterally expel a member and, in so doing, bar the expelled entity from engaging in stock trading, all without governmental superintendence or control." 121 F.4th at 1324. A private nondelegation violation exists because:

> the SEC does not exercise ultimate control over FINRA's decisions to expel its members in expedited proceedings because those orders take effect immediately, before the SEC can review them, and the severe consequences associated with expulsion can make any later review by the SEC a largely academic exercise.

*Id.* The D.C. Circuit also explained why "the SEC's stay authority" is "insufficient to satisfy constitutional requirements":  because a "stay is not automatic," is "not easily obtained" but requires an "extraordinary showing," and because a decision on a stay is "not a decision of the merits." *Id.* at 1326-27. An "administrative stay," like the one the SEC issued on the Clearing Agencies' CTA decision, carries these same deficiencies, and worse, since it is only an "interim" measure. *Id.* at 1327.

Notably, FINRA has since recognized the correctness of the D.C. Circuit's reasoning by proposing to change its rules – in direct and explicit response to the D.C. Circuit's decision – so that sanctions resulting in the expulsion of members, cancellation of membership, and other FINRA actions that "share the relevant characteristics" with the sanction at issue in *Alpine v. FINRA*, would *not* become effective until the time for seeking SEC review has expired or the SEC completes its review on the merits.[17] Yet the Clearing Agencies – FINRA's sister SROs – which have precisely the same procedure, have failed to amend their rules to align with FINRA's or with the ruling of the D.C. Circuit.

---

[17] *See Notice of Filing and Immediate Effectiveness of Proposed Rule Change to Stay the Effectiveness of Specified Expulsions and FINRA Actions,* SEC Release No. 34-103228; File No. SR-FINRA-2025-004, at 2-4 (June 11, 2025) (stating that this proposed rule change is intended to "align" FINRA's rules with the D.C. Circuit's decision in *Alpine v. FINRA*). A copy of the proposed rule is available on the SEC's website: https://www.sec.gov/files/rules/sro/finra/2025/34-103228.pdf. Courts may take judicial notice of information on a government website. *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,* 565 F.3d 702, n.22 (10th Cir. 2009).

In *Horsemen's II,* the Fifth Circuit found a facial private nondelegation violation from a private entity's (the Authority) unchecked enforcement powers, but went even further than the D.C. Circuit. *See Horsemen's II,* 107 F.4th at 428-235. The statute at issue, HISA, gave the Authority the power to investigate potential violations, make charging decisions and impose sanctions on covered entities – "all quintessentially executive functions" – without prior approval of the agency. *Id.* at 428-29. This is unconstitutional because "[t]he inescapable conclusion" is that "[a] private entity that can investigate potential violations" and impose penalties, "all *without the say-so of the agency*—does not operate under that agency's authority and surveillance." *Id.* at 430. Further, because launching an investigation, charging a violation, adjudicating, and sanctioning a party are themselves acts of enforcement, "[i]t is no answer to say that the [agency] can come in at the tail end of this adversarial process and review the sanction. As far as enforcement goes, the horse was already out of the barn." *Id.*

The Clearing Agencies' unchecked enforcement power and adjudicatory proceedings contravene the private nondelegation doctrine for the exact same reasons discussed in these decisions. The Clearing Agencies are empowered to exercise unchecked prosecutorial discretion to decide *independently* who to investigate, prosecute, adjudicate and ultimately who and how to punish. More specifically, the Clearing Agencies – without any direction or preapproval by the

SEC – decided to investigate Alpine, made the determination of what sanction to impose, convened a Hearing Panel comprised of its own Board as judge and jury, made all procedural and evidentiary decisions during the CTA proceeding, and issued the final and immediately effective CTA sanction against Alpine. Appx.Vol.1:35-38, 45-48. This sanction, upon implementation, would prevent Alpine from operating as a self-clearing broker-dealer and put Alpine out of business. Appx.Vol.1:22, 29, 47-48; Appx.Vol.2:28-30.

The Clearing Agencies are impermissibly exercising each of these enforcement powers in their discretion,[18] and not in a ministerial or advisory capacity, but as the "principal decisionmakers." *Oklahoma,* 62 F.4th 229 (where a private entity "retains full discretion over any regulations…that is an unconstitutional exercise of federal power.").[19] The SEC's review authority is triggered only *after* a "final" sanction is imposed, 15 U.S.C. § 78s(d)-(e), which cannot cure the Clearing Agencies' exercise of unsupervised executive power prior

---

[18] The Clearing Agencies have "discretion" to "determine" when to cease to act for a member. Appx.Vol.1:140-41, 195, including NSCC's Rules & Procedures, Rule 46, *and* DTC's Rules, Rule 10 (titled "Discretionary Termination" that DTC can exercise "based on its judgment").

[19] The Fifth's Circuit's hypothetical is also apt here: "Suppose a city structures its speeding laws to let a group of private car enthusiasts monitor speeds with their own radar guns, pull speeders over, and ticket them. Fines are reviewed by the police department and, ultimately, the mayor. Who *enforces* the speeding laws? Anyone would say the private group." *Horsemen's II,* 2024 WL 3311366 at *10.

4924-3943-9184, v. 1

to that review. Such actions violate the Constitution under both the D.C. Circuit's and Fifth Circuit's analysis.[20]

The district court's efforts to distinguish *Alpine v. FINRA* and *Horsemen's II* are unpersuasive, particularly on a motion to dismiss. With respect to *Alpine v. FINRA,* the district court first sought to distinguish it because the CTA proceeding "is not expedited." Order, at 15. The basis for this conclusion is unclear. While there is no set time frame for the hearing to occur under NSCC's rules, it may occur in as little five business days after notice,[21] whereas a FINRA expedited proceeding must occur within 10 days after notice. *Alpine v. FINRA,* 121 F.4th at 1322. Further, the D.C. Circuit's focus was not on how quickly the proceedings occur, but on the fact that the expulsion sanctions in expedited proceedings under FINRA's rules are immediately effective before SEC review on the merits. *Alpine v. FINRA,* 121 F.4th at 1326, 1331. The Clearing Agencies' CTA determination is immediately effective

---

[20] The *Oklahoma* Court rejected a facial private nondelegation challenge to HISA's enforcement scheme because the private party's "adjudication decisions are ***not final*** until the FTC has the opportunity to review them." *Id.* (emphasis added). The Fifth Circuit came to a different conclusion by analyzing the breadth of the enforcement powers being exercised without agency involvement and prior to agency review. *Horsemen's II,* 2024 WL 3311366 at **8-12. The Clearing Agencies' enforcement activities violate the private nondelegation doctrine under either Circuit's approach, including because the Clearing Agencies' disciplinary decisions and sanctions are immediately effective and final prior to SEC review. They *must* be final to trigger SEC review. 15 U.S.C. § 78s(d).

[21] NSCC Rule 37; DTC Rule 22. Appx.Vol.1:136, 201.

upon issuance, just like the expulsion order in the FINRA expedited proceeding.[22] The district court disregarded that the D.C. Circuit expressly holding that the "SEC's stay authority … is insufficient to satisfy constitutional requirements of meaningful SEC merits review." *Id.* at 1326.

The district court next sought to distinguish *Alpine v. FINRA* on the basis that broker-dealers are not required to be members of the Clearing Agencies, and that NSCC and DTC are not the only registered clearing agencies. Order, at 16. This conclusion was contrary to the express allegations of Alpine's complaint. As Alpine has alleged, it is only able to act as a self-clearing broker to clear trades for its customers if it is a member of the Clearing Agencies. Appx.Vol.1:22, 29, 47-48.

These Clearing Agencies provide clearing and settlement "for virtually all securities transactions in the United States." *Pet Quarters,* 559 F.3d at 776-777.[23] The SEC has stated that the Clearing Agencies' CTA sanction means that a broker-dealer "could no longer operate as a self-clearing broker."[24] Simply put, Alpine is a self-clearing broker that needs to a member of NSCC and DTC to operate its

---

[22] In this instance, the Clearing Agencies delayed implementation of the decision so that Alpine could seek a stay from the SEC, but under their rules a CTA decision is a final decision that is immediately effective *prior to* full SEC review *on the merits*. NSCC Rule 37, 46, 48; DTC Rule 21, 22, Appx.Vol.1:138, 140-42, 200, 203. It *must* be "final" to trigger SEC review. 15 U.S.C. § 78s(e).

[23] *See also* Appx.Vol.1:16, 22, 24-25, 28-29, 38, 47-48; Appx.Vol.2:9-11, 14-15.

[24] *Lek Sec. Corp.,* 2022 WL 1769802 at *1.

business. Appx.Vol.1:22, 29, 47-48. The district court was required to treat Alpine's allegations as true (they are true) at this stage. *Casanova,* 595 F.3d at 1124-25.

The district court's foray into fact finding was improper also because it was unsupported and inaccurate. The district court did not identify who these alternative clearing agencies are or what types of markets they operate in, and there exists no basis for concluding that Alpine is able to clear equity trades except through the Clearing Agencies.

The district court's response to *Horsemen's II* also failed to engage with the Circuit's reasoning and disregarded the extent of the Clearing Agencies' powers. The district court sought to distinguish *Horsemen's II* because the Clearing Agencies enforce their own rules, rather than a statute. But, as indicated, the Clearing Agencies' rules have the force of federal law, *see, e.g., McDaniel,* 717 F.3d at 673, and Congress has recognized that SRO's internal disciplinary proceedings and authority to impose sanctions are an "exercise [of] government power." S. REP. 94-75, at 24, 1975 U.S.C.C.A.N. 179. They are also statutorily obligated to enforce their rules, *see* 15 U.S.C. § 78s(g)(1)(C), and have unilateral authority to decide – without the SEC's say-so – to commence an investigation, conduct an adjudication and impose significant, self-executing sanctions, including monetary fines, or the more

onerous CTA/termination of membership sanction that prevents a firm, like Alpine, from operating as a self-clearing broker, and can put it out of business.[25]

These unchecked enforcement powers raise precisely the same constitutional concerns identified by the Fifth Circuit in *Horsemen's II,* even if the private entity there may have had some additional enforcement powers. *See* 107 F.4th at 426. Notably, *Alpine v. FINRA* involved a violation of FINRA's internal rules, not the Exchange Act, and this did not preclude the D.C. Circuit from finding a private nondelegation violation. 121 F.4th at 1323. It does not here, either.

The district court's reliance on the Fifth Circuit's reference to the SEC-FINRA model in *Horsemen's II* is an outdated and irrelevant aside. Order, at 14-15. While the Circuit may have generally cited this model for comparison, it did so based on the notion that FINRA's actions do not become effective until review by the agency; it did *not* consider the *particular procedures* at issue in the *Alpine v. FINRA* case and this case, where the private corporation is permitted to act without adequate agency oversight. And it explicitly stated that it "express[es] no opinion on whether the SEC-FINRA relationship poses any constitutional issues under the private nondelegation doctrine (or any other doctrine)." 107 F.4th at 435 n.20. Of course, the D.C. Circuit found a private nondelegation problem in FINRA's enforcement

---

[25] NSCC Rules 37, 46, 48; DTC Rules 10, 21, 22. Appx.Vol.1:138, 140-42, 200, 203. NSCC's fines can reach $20,000 per violation. NSCC Rule 48. DTC's rules impose no limit on fines per violation. DTC Rule 21.

activities, *Alpine v. FINRA,* 121 F.4th at 1326, which FINRA acknowledged was correct by changing its rules, as discussed above.

Moreover, the Supreme Court was sharply critical of the efficacy of the SEC's general oversight mechanisms with respect to the PCAOB in *Free Enterprise,* 561 U.S. at 503-505. The SEC has the same general oversight powers over the PCAOB as it does over SROs, and the Supreme Court nonetheless held they provided only "some latent Commission control" that was insufficient to supervise the PCAOB's "significant independence" to take "significant enforcement actions" and "interven[e] in the affairs of regulated firms … without Commission preapproval or direction." *Id.* at 504-05. As with the PCAOB, the Exchange Act "nowhere gives the Commission effective power to start, stop or alter individual [SRO] investigations, executive activities typically carried out by officials within the Executive Branch." *Id.* at 504. And, because the SEC's rulemaking power "is obviously a poor means to micromanage the [PCAOB's] affairs" and its "daily exercise of prosecutorial discretion," *see id.,* the same must be true for SROs. The SEC's powers to de-register an SRO, limit its activities, or remove its leadership can only be exercised for cause, 15 U.S.C. § 78s(h)(1), (4), and are thus a poor tool to supervise an SRO's day-to-day exercise of executive enforcement authority, particularly for enforcement activity has already occurred*,* as here. *Free Enterprise,* 561 U.S. at 504-05.

The district court thus erred in relying on the SEC's general oversight powers, and in failing to recognize that the Fifth and D.C. Circuits' rationale is equally applicable to the unchecked enforcement authority being wielded by the Clearing Agencies here. As reflected in the holding of the Fifth Circuit and the reasoning of Judge Walker in his concurrence and partial dissent in *Alpine v. FINRA,* the "problems" with the Clearing Agencies "enforcement proceedings runs even deeper," since they "wield[] significant executive authority" when they "investigate[], prosecute[], and initially adjudicate[] allegations against a company …." 121 F.4th at 1338. The possibility of after-the-fact SEC review cannot "cure[] [the] constitutional defect" because it "does not negate the vast array of powers that [an SRO] exercises *before* the matter even reaches the SEC." *Id.* at 1345; *accord Horsemen's II,* 107 F.4th at 435 (holding that a structure that "empowers the [private party] with quintessential executive functions and gives the [agency] scants oversight until enforcement has already occurred" is not constitutional).

### III. The District Court Erred in Dismissing Alpine's Article II Appointment and Removal Claims.

#### A. The Clearing Agencies' Structure Does Not Comply with Article II.

Under our Constitution, the "executive power"—all of it—is "vested" in the President alone. U.S. Const. art. II, § 1, cl. 1. This provision makes *no* exception for outsourcing of executive power. *See id.* Nor would an exception make sense. The keystone principle of Article II is democratic accountability. The People are entitled

to have someone who is accountable for federal policy failures and victories, and the President is the person most democratically accountable to the People. *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 590 U.S. 448, 457 (2020) (emphasis added)).

To ensure that executive power remains with the President, the Constitution places limitations on those who exercise it on the President's behalf. Thus, anyone who "wield[s] significant executive power" must be appointed by an appropriate government body under the Appointments Clause. *Buckley v. Valeo,* 424 U.S. 1, 126 (1976); *see also Lucia v. SEC,* 585 U.S. 237, 244 (2018). And, the Officers must be removable by the President or an officer subordinate to the President. *Free Enterprise,* 561 U.S. at 484. These Constitutional "structural constraints, designed in part to ensure political accountability, ***apply to all exercises of federal power***." *Aurelius,* 590 U.S. at 457 (emphasis added)).

The Clearing Agencies' structure does not comply with either the Presidential appointment or removal requirements of Article II. None of the Clearing Agencies' Board members, the CTA Hearing Panel (comprised of three Board members) or their executives are appointed by a government body in accordance with the Appointments Clause. *See* U.S. Const. art. II, § 2, cl. 2; *Lucia,* 585 U.S. at 244 (describing appointment requirements). Rather, the Clearing Agencies' Board is selected by DTCC shareholders/members, and the Clearing Agencies' executives

and officers are selected by the Board. Appx.Vol.1:24-25, 38-39, 49-50. The Hearing Panel formed for Clearing Agencies' disciplinary process is handpicked *by the Chairman of the Board* from among Board members. Appx.Vol.1:22, 43, 46.

Nor are the Clearing Agencies' Board, executives, or Hearing Panel members accountable to the President due to multilevel protection from removal. *Free Enterprise,* 561 U.S. at 484. The Clearing Agencies' Board members—generally, or when serving as a Hearing Panel—and executives can only be removed by the SEC for cause, 15 U.S.C. § 78s(h)(4), and the President cannot remove SEC commissioners at will. *Free Enterprise,* 561 U.S. at 487. This kind of multilevel protection from removal is unconstitutional because it infringes on the President's "ability to execute the laws … by holding his subordinates accountable." *Id.* at 496.

There is thus no debate that the Clearing Agencies' structure fails to comply with either the presidential appointment or presidential supervision and removal requirements of Article II. As such, the key question on Alpine's Article II claims (Claims I and II) is whether the Clearing Agencies are exercising "significant executive power." As detailed above, they plainly are, and not as mere aides and advisors, but as front-line decisionmakers in enforcing rules with the status of federal law, adjudicating liability through an in-house Hearing Panel, and imposing sanctions they select in their discretion. The enforcement of federal law is a core, if

not *the quintessential,* executive power. *See, e.g., Horsemen's II,* 107 F.4th at 428.[26]

The Clearing Agencies not only exercise unsupervised government power – they do so without abiding by any of the associated constraints on government power. Because they bear the label "private entity," they have been permitted to wield government power without being subject to the constitutional protections and restraints that apply to the SEC, and thus exercise power that extends *even beyond that of their delegating agency*. This has been permitted to occur notwithstanding the well-established principle that agents cannot "exercise[e] powers their principles do not possess and so cannot delegate." *Ackerman,* 831 F.3d 1300. More important, Supreme Court precedent establishes that where the Clearing Agencies exercise executive power, assuming they may do so at all, they must be subject to the supervision and control of the President, as required by Article II.

For example, applying these principles in *Lucia v. SEC,* the Supreme Court held that SEC ALJ's are "Officers of the United States," and thus must be appointed consistent with the Appointment's Clause. 585 U.S. at 241. This Court explained that SEC ALJs exercise "significant discretion," have "the authority needed to ensure fair and orderly adversarial hearings," and may serve as the "last-word" in an

---

[26] *See also Free Enterprise,* 561 U.S. at 492 ("As Madison stated on the floor of the First Congress, 'if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws.'" (quoting 1 Annals of Cong. 463 (1789)).

4924-3943-9184, v. 1

enforcement actions. *Id.* at 247-252. All of that is true also of the Clearing Agencies'
Hearing Panel (comprised of members of the Clearing Agencies' Board) in
disciplinary proceedings. And, while the Hearing Panel's decision is subject to *de
novo* review by the SEC once it is final, so too are the decisions of the SEC ALJs,
*id.* at 241, under the same *de novo* standard. *Id.* at 271 (Sotomayor, J., *dissenting*).
To permit the Clearing Agencies, through their Hearing Panel, to perform precisely
the same function as ALJs without any accountability to the President or adherence
to other constitutional protections would make no sense.

As Judge Walker cogently observed in analyzing *Lucia's* applicability to
FINRA's hearing officers:

> There is no reason to think that nearly identical hearing officers
> who are private, rather than governmental, can enjoy the same
> degree of authority without (at least) the same restrictions. That
> would mean that the Constitution requires less accountability
> when significant executive authority is delegated outside the
> executive branch than when such authority is delegated *within* it.

*Alpine v. FINRA,* 121 F.4th at 1345 (Walker, J. *concurring and dissenting in part*).
The same is true here, but the exercise of power by the Clearing Agencies is even
more extreme – flagrantly discarding even a pretense of a neutral or fair arbiter.
Here, as with the SEC and FINRA, the adjudicators need to be properly appointed
and removable by the President under Article II.

4924-3943-9184, v. 1

## B. The District Court Applied the Wrong Test in Holding the Clearing Agencies Are Not Subject to Constitutional Requirements.

The district court swept these foundational principles aside, accepting the Clearing Agencies' argument that they are not subject to Article II's structural-constitutional demands because the Clearing Agencies are not "governmental entit[ies]," even when exercising executive authority. Order, at 10-11. The district court held the Supreme Court created an exclusive test in *Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374 (1995) for when a corporation may be considered "a governmental entity subject to constitutional constraints."[27] Order, at 10.

But the Supreme Court has never held that only entities that meet the *Lebron* factors are subject to constitutional structural mandates. *Lebron* did not even involve that issue; it involved a First Amendment claim. 513 U.S. at 399. The Supreme Court has instead repeatedly emphasized that the key is the nature of the power exercised, not the label attached to the actor: *anyone* "exercising significant executive authority … is an 'Officer of the United States.'" *Buckley,* 424 at 126; *accord Lucia,* 585 U.S. at 245 (same); *Edmond v. United States,* 520 U.S. 651, 662 (1997) ("The exercise of 'significant authority pursuant to the laws of the United States' marks, not the line between principal and inferior officer … but rather … ***the line between officer and***

---

[27] Those factors are: (1) the government must "create[] a corporation by special law," (2) "for the furtherance of governmental objectives"; and (3) retain "permanent authority" to appoint the majority of the directors of the corporation. *Lebron,* 513 U.S. at 400.

4924-3943-9184, v. 1

*nonofficer*." (citation omitted) (emphasis added)); *Aurelius,* 590 U.S. at 457 (constitutional "structural constraints, designed in part to ensure political accountability, apply to ***all exercises of federal power***." (emphasis added)). This Circuit has likewise held that labels do not control the constitutional inquiry when evaluating an entity's use of executive power, holding "[t]hat an entity might be incorporated … doesn't prevent it from also qualifying as a governmental entity: the dispositive question isn't ***one of form but function, turning on what the entity does, not how it is organized***." *Ackerman,* 831 F.3d at 1295 (emphasis added).[28]

As the Office of the Legal Counsel has further explained, any "position to which has been delegated by legal authority a portion of the sovereign powers of the federal Government, and which is 'continuing,' must be appointed pursuant to the Appointments clause." *Officers of the United States Within the Meaning of the Appointments Clause,* 31 U.S. Op. O.L.C., at 73, 2007 WL 1405458 (Apr. 16, 2007). "[F]ederal employment is not necessary for the Appointment's Clause to apply," and its application "does not depend on whether Congress has formally and directly created an 'office.'" *Id.* at 78. "[W]hat matters is the nature of a position—its authority and continuance—not its label, and thus not whether Congress placed it

---

[28] Further undercutting the notion that *Lebron* creates an exclusive test is the fact that the Supreme Court did not mention *Lebron* once, despite evaluating whether a private entity was a state actor, in *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802 (2019) or *Collins v. Yellen,* 141 S. Ct. 1761, (2021).

4924-3943-9184, v. 1

within the federal service." *Id.* at 73.

It makes no difference that the Clearing Agencies are purportedly "private." If anything, that makes the constitutional problem worse, not better, for exactly the reason Judge Walker articulated in *Alpine v. FINRA, supra.* To hold otherwise would allow Congress or the President to evade the essential principles of political accountability protected by our constitutional structure through the simple act of delegating federal power to a "private" entity that, for one reason or another, does not meet a *Lebron* factor. After all, as the Supreme Court stated in *Lebron*, "[i]t surely cannot be that government … is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." 513 U.S. at 397.

The district court's narrow view also fails to reconcile with the "state action" doctrine, under which nominally private parties can be subjected to constitutional constraints in their exercise of particular governmental powers. State action does not turn on whether the *Lebron* factors are met – entity characteristics – but rather on function and activities – *e.g.,* joint participation, delegation of a public function, and "entwinement." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 288-89, 296 (2001); *Ackerman,* 831 F.3d at 1295.

Notably, those authorities confirm that a private party exercising federal authority is subject to other constitutional requirements. Creating a distinction as to

Article II would relegate the Constitution's structural provisions to second-class status, even though the Clearing Agencies are exercising significant *executive* authority. Because the executive power belongs *entirely* to the President, *Seila Law,* 591 U.S. at 213, it is imperative that all those exercising that power do so within Article II's constraints, including presidential control. It makes no sense to conclude that Article II is violated when the PCAOB exercises the President's power without being subject to his control, but not when SROs exercise that executive power, with virtually identical for-cause-removal insulation from presidential control. *Free Enterprise,* 561 U.S. at 504-05, 514. Being a government-created or funded entity has little relevance, let alone importance, to the problem.

The Clearing Agencies are exercising significant executive authority, employing a system in which they have "discretion" to "determine" that they can "cease to act" for Alpine, and thereby force its closure, in a proceeding before a Hearing Panel comprised of members of their own Board. Yet, their structure does not comply with Article II. This violates the Constitution, regardless of whether they are on the government's payroll.

## IV.    Alpine's Due Process Claim is Viable and Was Properly Before the District Court.

Alpine's Fourth Claim for relief asserts that the Clearing Agencies' expedited hearing process is so biased and unfair that it violates Alpine's due process rights under the Fifth Amendment. Appx.Vol.1:43-48, 53-54.

50

The Clearing Agencies, who exercise continuous and significant federal power, must provide due process in their adjudicatory proceedings, regardless of whether they are a governmental actor for Article II purposes. This Circuit has repeatedly held that SROs are subject to due process requirements in their adjudicatory proceedings. *Rooms v. SEC.,* 444 F.3d 1208, 1214 (10th Cir. 2006); *General Bond & Share Co. v. SEC.,* 39 F.3d 1451, 1455 (10th Cir. 1994). The Supreme Court has held that "due process requires a 'neutral and detached judge in the first instance,' and the ***command is no different when a legislature delegates adjudicative functions to a private party***." *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 617 (1993) (citations omitted) (emphasis added). Congress came to a similar conclusion in amending the Exchange Act in 1975: "Recognizing that the self-regulatory organizations utilize governmental-type powers in carrying out their responsibilities under the Exchange Act highlights the fact that these organizations must be required to conform their activities to fundamental standards of due process …." S. REP. 94-75, at 25.

There is no question that the Clearing Agencies' adjudicatory process fails to provide even a façade of impartiality and fairness. The Hearing Panel assembled to preside over the proceeding, evaluate NSCC's and DTC's allegations against Alpine, and decide Alpine's fate consisted of three members of Defendants' collective Board – which had already authorized the CTA. Appx.Vol.1:43, 46. There is every

indication from this composition that the Hearing Panel was inherently biased—the Clearing Agencies act as prosecutors, judge, jury and executioner. The Board positions are prestigious and any ruling by a member that is averse to the organization would certainly impact their standing in that organization. Appx.Vol.1:22-23, 38, 43, 46. That this CTA proceeding followed on the heels of Alpine's filing of a lawsuit against the organization only intensifies the appearance and/or level of retaliation bias. Appx.Vol.1:46. With a Hearing Panel handpicked by the Chairman of the Clearing Agencies' Board, the outcome of the hearing was a foregone conclusion before it occurred. Appx.Vol.1:46-48.

The lack of a neutral adjudicator alone violates due process. *See Concrete Pipe,* 508 U.S. at 617-18. The Supreme Court, in *SEC v. Jarkesy*, 144 S.Ct. 2117 (2024) and *Lucia,* 585 U.S. at 247-52, held that the SEC must provide not only a "neutral arbitrator" (rather than an ALJ employed by the SEC), but also, for certain claims, a trial by jury to avoid "concentrat[ing] the roles of prosecutor, judge and jury in the hands of the Executive Branch." *Jarkesy,* 144 S.Ct. at 2139.[29] Further, the D.C. Circuit has held that a private party cannot be imbued with the power to expel a member firm from the industry. *Alpine v. FINRA,* 121 F.4th at 1324. It is antithetical to principles of fairness to allow the SROs to deprive firms of the protections

---

[29] Although the Supreme Court relied on the Seventh Amendment right to a jury trial, the decision was equally compelled by the Due Process Clause. *See id.,* 144 S.Ct 2145 (Gorsuch, J. concurring).

4924-3943-9184, v. 1

afforded by the Constitution, and to do that which the delegating agency is not permitted to do, particularly where they are attempting to deprive a firm of the ability to conduct its business.

The district court declined to consider these obvious due process violations, however, instead applying the factors from *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200 (1994), to conclude that that the "special statutory review scheme" of the Exchange Act stripped it of jurisdiction to consider Alpine's due process claim. Order, at 6-10. This was error following the Supreme Court's decision in *Axon Enter., Inc. v. FTC,* 598 U.S. 175 (2023), which held that the statutory review scheme of the Exchange Act does not displace federal question jurisdiction to review claims that an entity is unconstitutionally structured or is "wielding authority unconstitutionally," *id.* at 189, including by subjecting parties "to an illegitimate proceeding, led by an illegitimate decision maker." *Id.* at 191.

That is the situation here because Alpine claims that Clearing Agency and Hearing Panel, which is drawn from the Clearing Agencies' collective Board, are unconstitutionally structured and are wielding executive power unconstitutionally – including the enforcement power of which the disciplinary process is an integral part. Alpine's due process claim is thus inextricably intertwined with its other constitutional claims, and Alpine challenges the entire CTA proceeding as an "illegitimate proceeding" with a clearly biased Board acting as an "illegitimate

4924-3943-9184, v. 1

decision maker." *Axon,* 598 U.S. at 191. Just like in *Axon*, Alpine's due process claim "protest[s] the 'here-and-now' injury of subjection to an unconstitutionally structured decision-making process," *Id.* at 192, and thus need not first proceed under the Exchange Act's review scheme. *Id.* at 195-96.

Moreover, *all* three *Thunder Basin* factors must be met to preclude jurisdiction. *Id.* at 186. They are not here. Certainly, the SEC has no special "expertise" in evaluating *any* constitutional claims, including a violation of due process, *id.* at 194-95. The district court also overlooked that the lack of an impartial adjudicator is a due process violation that "even [a]ppeal and a trial *de novo* will not cure," *Concrete Pipe,* 508 U.S. at 617, and thus another *Thunder Basin* factor is not met because "the preclusion of district court jurisdiction could foreclose all meaningful review." *Axon,* 598 U.S. at 190. This Court should reverse because jurisdiction exists to review all of Alpine's claims.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Order dismissing Alpine's claims, and remand for further proceedings.

## STATEMENT OF ORAL ARGUMENT

Alpine respectfully requests that the Court schedule oral argument on this appeal to aid the Court in its consideration of the issues raised herein. This appeal presents complex questions regarding the application of constitutional law,

4924-3943-9184, v. 1

including at least one of which appears to raise an issue of first impression in this circuit: application of the private nondelegation doctrine. Oral argument would allow the parties to address any questions the Court may have as it considers these complex issues, and ultimately aid the Court in its analysis of the issue in this appeal.

Dated this 23rd day of June 2025.

/s/ Aaron D. Lebenta
Aaron D. Lebenta (UT Bar 10180)
CLYDE SNOW & SESSIONS, P.C.
201 South Main Street, Suite 2200
Salt Lake City, Utah 84111
Tel/Fax: 801.322-2516
adl@clydesnow.com

/s/ Maranda E. Fritz
Maranda E. Fritz
MARANDA E. FRITZ, P.C.
521 Fifth Avenue, 17th Floor
New York, New York 10175
Telephone: 646.584.8231
maranda@fritzpc.com
*Attorneys for Appellant Alpine Securities Corp.*

4924-3943-9184, v. 1

# CERTIFICATE OF COMPLIANCE

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 12,985 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Tenth Circuit Rule 32(B).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(5) and (6) and 10th Cir. Rule 32(A) because it has been prepared in a proportionately spaced typeface using Microsoft Word of Office 365 in 14-point Times New Roman Font.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

Dated this 23rd day of June 2025:

*/s/ Aaron D. Lebenta*
Aaron D. Lebenta
*Counsel for Appellant Alpine Securities Corp.*

4924-3943-9184, v. 1

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing Brief of Appellant:

(1) Any required privacy redactions have been made;

(2) The paper copies of the brief to be filed with the Court are exact copies of the scanned brief; and

(3) The digital submissions have been scanned for viruses with Secure Client UI Version 5.0.00837/Secure Endpoint Version 8.2.1.21650 and according to the program are free of viruses.

Dated this 23rd day of June 2025:

_/s/ Aaron D. Lebenta_____
Aaron D. Lebenta
*Counsel for Appellant Alpine Securities Corp.*

4924-3943-9184, v. 1

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June 2025, I caused the foregoing Brief of Appellant to be filed and served electronically on all parties through known counsel of record, using the appellate CM/ECF system.

*/s/ Aaron D. Lebenta*
Aaron D. Lebenta
*Counsel for Appellant*

4924-3943-9184, v. 1

# ATTACHMENT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, a Utah corporation,<br><br>      Plaintiff,<br><br>v.<br><br>NATIONAL SECURITIES CLEARING CORPORATION, THE DEPOSITORY TRUST & CLEARING CORPORATION, and THE DEPOSITORY TRUST COMPANY,<br><br>      Defendants,<br><br>UNITED STATES OF AMERICA,<br><br>      Defendant-Intervenor. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:23-cv-00782-JNP-JCB<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Jared C. Bennett |

Before the court is a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendants National Securities Clearing Corporation ("NSCC"), the Depository Trust & Clearing Corporation ("DTCC"), and the Depository Trust Company ("DTC") (collectively, "Defendants"). ECF No. 64 ("Defs.' Mot."). Plaintiff Alpine Securities Corporation ("Plaintiff" or "Alpine") filed this action, alleging constitutional violations and seeking relief from adjudicatory actions and enforcement of rules promulgated by NSCC and DTC, subsidiaries of DTCC. ECF No. 36 ("Pl.'s Am. Compl."). Because Plaintiff challenges the constitutionality of federal securities laws, the United States intervened on behalf of Defendants under Federal Rules of Civil Procedure 5.1(c) and 24(a)(1). ECF No. 28. For reasons set forth herein, Defendants' motion to dismiss is GRANTED. The court dismisses Plaintiff's due process claim WITHOUT PREJUDICE and Plaintiff's remaining claims WITH PREJUDICE.

## BACKGROUND

As self-regulatory organizations ("SROs"), clearing agencies have been a fixture of the U.S. market since Congress passed Section 17A of the Securities Exchange Act (the "Act" or "Exchange Act") in 1975. Clearing agencies facilitate the clearing and settlement process that is essential to the operation of the securities market.

> When investors agree to trade an equity security, the purchaser promises to deliver cash to the seller and the seller promises to deliver the security to the purchaser. The process by which the seller receives payment and the buyer, the securities, is known as clearance and settlement. To reduce risks and increase efficiency in the market . . . trades in equities and other securities are typically cleared and settled through registered clearing agencies such as NSCC.

ECF No. 30 ("United States Memo of Law"), at 2 n.1 (internal quotation marks omitted).

Defendants NSCC and DTC, subsidiaries of DTCC, are two of several private clearing agencies registered with the Securities and Exchange Commission ("SEC"). *See* U.S. SEC. AND EXCHANGE COMM'N, *Self-Regulatory Organization Rulemaking* (Nov. 7, 2024), https://www.sec.gov/rules/sro. These private clearing agencies provide settlement and clearing services to their members, including Alpine.

Prior to the passage of Section 17A, the act of clearing and settling a security transaction "involved delivery of the physical stock certificates to the buyer, typically through a web of brokers and dealers." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 776 (8th Cir. 2009). As one might expect, this process became inefficient and progressively challenging as transactions increased in volume. As a result, Congress passed Section 17A, directing the SEC "to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities." 15 U.S.C. § 78q-1(a)(2)(A)(i).

Thus, Section 17A spawned SEC regulation and oversight of various private entities that operate as clearing agencies. Today, clearing agencies provide a critical risk management function for the securities industry. Subject to SEC supervision, clearing agencies promulgate and enforce their own rules for their members to ensure the reliable and efficient transfer of securities in the financial market.

## I.    SEC OVERSIGHT OF CLEARING AGENCIES

Under the Act, the SEC has the authority to register and regulate clearing agencies in accordance with statutory criteria enacted by Congress. *Id*. § 78q-1(b)(3). To register, a clearing agency must have the ability to "facilitate the prompt and accurate clearance and settlement of securities transactions" and to "safeguard securities and funds in its custody or control or for which it is responsible." *Id*. § 78q-1(b)(3)(A). In addition to registration requirements, the SEC has promulgated other regulations consistent with Section 17A, including a requirement that clearing agencies establish policies and procedures to "[m]aintain a sound risk management framework." 17 C.F.R. § 240.17ad-22(e)(3).

The SEC also reviews any rules promulgated by clearing agencies. Prior to promulgation, each rule proposed by a clearing agency must undergo public notice and comment and review by the SEC. 15 U.S.C. § 78s(b)(1). The SEC may approve a proposed rule only if it finds the rule "consistent with [the] requirements" of the Exchange Act and its implementing regulations. *Id*. § 78s(b)(2)(C). The SEC's decisions regarding both proposed rules and clearing agency registrations are subject to judicial review. *See Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1094.

Clearing agencies must also comply with any rules prescribed by the SEC "as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of

the purposes of [the Exchange Act]." 15 U.S.C. § 78q-1(d)(1). The SEC may limit a clearing agency's activities and operations or suspend or revoke its registration "if in [the SEC's] opinion such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the statute]." *Id.* § 78s(h)(1). Finally, the SEC has authority to review any adjudicatory actions taken by a clearing agency, including any disciplinary action taken against a member. *Id.* § 78s(d).

## II.    THE RULE AT ISSUE AND PROCEDURAL HISTORY

One way in which NSCC manages risk in accordance with SEC regulations is through Excess Net Capital ("ENC") requirements for its members. This requirement ensures members maintain a buffer to absorb potential losses. If a member is unable to meet this obligation, NSCC can levy disciplinary action against the member, including terminating services for that member. In turn, clearing agencies are required by the SEC to ensure members comply with rules such as ENC requirements to prevent default and mitigate financial vulnerability.

In 2023, NSCC changed the ENC calculation through the promulgation of a rule (the "ENC Rule"). Pursuant to the rule, NSCC bases each member's ENC obligation on (i) the member's clearing status, either "Self-Clearing" or "Clears for Others," and (ii) the level of risk the member presents to NSCC. The SEC approved the ENC Rule and set an effective date of August 26, 2023, with a 60-day grace period for members to comply.

After the ENC Rule's grace period expired, Plaintiff filed this action in the District of Utah. Plaintiff alleges that the new ENC Rule skyrocketed their capitalization requirement from $1 million to $10 million, an effect that discriminates against smaller broker-dealer firms like Plaintiff. On November 9, 2023, NSCC and DTC sent a "Notice of Intent to Cease to Act," advising Plaintiff that they would terminate its membership, subject to a hearing. In the Notice,

Defendants reasoned that Plaintiff failed to comply with the new ENC Rule and submitted inaccurate ENC data.

In February 2024, Plaintiff moved for a temporary restraining order and preliminary injunction to enjoin Defendants from pursuing disciplinary action against it. The court subsequently denied Plaintiff's motion. ECF No. 51 ("Order Denying TRO"). In March 2024, DTCC held a hearing after which it affirmed its subsidiaries' decision to cease to act for Plaintiff and terminate its membership. Plaintiff requested SEC review of Defendants' decision, as well as a stay of Defendants' decision pending that review. On May 14, 2024, the SEC granted an administrative stay pending its decision on Plaintiff's motion to stay.

The operative complaint, amended in February 2024, alleges four separate claims for violation of (1) the separation-of-powers doctrine, (2) the Appointments Clause, (3) the nondelegation doctrine, and (4) the Due Process Clause of the Fifth Amendment. *See* Pl.'s Am. Compl. Plaintiff also seeks declaratory relief that Defendants are state actors subject to constitutional requirements and that their organization and operation as well as the new ENC Rule and associated disciplinary proceedings are unconstitutional. Defendants moved to dismiss all of Plaintiff's claims, arguing that the court lacks subject matter jurisdiction and Plaintiff failed to state a claim upon which relief can be granted.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a court may dismiss an action for lack of subject matter jurisdiction. The issue of subject matter jurisdiction can be raised at any time in the litigation process, and a district court *must* dismiss an action "[i]f it determines . . . that it lacks subject-matter jurisdiction." FED. R. CIV. P. 12(h)(3). Because the federal courts are courts of limited jurisdiction, "[t]he party invoking the jurisdiction of the court has the duty to establish

5

that federal jurisdiction does exist . . . ." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). Thus, Plaintiff bears the burden of proof.

The court may also dismiss any action that fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In evaluating a motion to dismiss under Rule 12(b)(6), the court takes the plaintiff's well-pleaded facts as true, drawing all inferences in the plaintiff's favor. *See Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's [] complaint alone is legally sufficient to state a claim for which relief may be granted." *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (internal quotation marks omitted).

## ANALYSIS

The court first considers its subject matter jurisdiction over Plaintiff's due process claim. Although all of Plaintiff's claims appear to be based on federal questions, some statutory schemes in administrative law cases may deprive the court of jurisdiction over certain claims. Thus, the court considers whether such a statutory scheme applies here.

The court then turns to address whether Plaintiff stated a legally sufficient claim under the separation-of-powers doctrine, Appointments Clause, and nondelegation doctrine.

## I.    SUBJECT MATTER JURISDICTION: DUE PROCESS

Defendants argue that the court lacks subject matter jurisdiction over Plaintiff's due process claim because the Exchange Act provides an alternative review scheme. "A special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter. v. FTC*, 598 U.S. 175, 185 (2023). To determine whether a statutory scheme deprives the district courts of jurisdiction, courts consider

6

the three factors outlined in the Supreme Court's decision in *Thunder Basin*: "First, could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim? Next, is the claim 'wholly collateral to [the] statute's review provisions'? And last, is the claim 'outside the agency's expertise'?" *Id.* (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994)).

In *Axon*, the Supreme Court noted that the Exchange Act does provide such a scheme that may preclude district court jurisdiction. *Id.* ("The agency effectively fills in for the district court, with the court of appeals providing judicial review."). But *Axon* held that the Exchange Act's statutory review scheme did not displace a district court's jurisdiction over claims challenging the constitutionality of the structure or existence of an agency. Thus, *Axon* distinguished constitutional structural claims from other claims. *See id.* at 177-78 (applying the *Thunder Basin* factors and concluding that they all weigh in favor of district court jurisdiction over structural constitutional challenges).

Specifically, the Court differentiated the claims in *Axon* from the due process claim asserted in *Thunder Basin*. Even though the due process constitutional challenge in *Thunder Basin* fell out of the agency's expertise, because "it could be meaningfully addressed in the Court of Appeals," the district court did not have jurisdiction over that claim. *Id.* at 177 (quoting *Thunder Basin*, 510 U.S. at 215). The Supreme Court contrasted this reasoning with that in *Free Enterprise Fund*, in which it held that an "Article II challenge to the structure of the Public Company Accounting Oversight Board—an agency regulating the accounting industry under the SEC's oversight—landed outside the Exchange Act's review scheme." *Id.* (referencing *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)).

Here, Plaintiff's first, second, and third claims resemble the claims asserted in *Axon* and *Free Enterprise Fund*. These claims relate to structural constitutional challenges, and the preclusion of district court jurisdiction where Congress provides a special statutory review scheme would not apply. But as the court previously concluded, the court does not have subject matter jurisdiction over Plaintiff's fourth claim for violation of the Due Process Clause of the Fifth Amendment. That claim is not a structural constitutional challenge, but rather more akin to the claim asserted in *Thunder Basin*. *See* Order Denying TRO at 10-11.

Still, Plaintiff urges the court to reconsider its reasoning, arguing that its due process claim is "intertwined with its structural constitutional claims because the Hearing Panel, which Alpine claims lacks the impartiality required for due process, is comprised of three of Defendants' Board Members. Defendants' Board is also the subject of Alpine's structural constitutional claims." Pl.'s Opp. at 28.

But even though the claims involve the same subject matter, they are two distinct claims. First, Plaintiff argues that it was not provided with an impartial hearing because the panel consisted solely of Defendants' board members who, by the nature of their board membership, could not provide impartiality. This is Plaintiff's claim under the Due Process Clause. And it is *this* claim over which the court lacks subject matter jurisdiction.

Separately, Plaintiff argues that the SEC does not provide adequate oversight over Defendants' board members. This is Plaintiff's third claim under the nondelegation doctrine, a structural constitutional challenge, that will be discussed in further detail below. This claim is similar to the claim in *Axon*, which alleged that "tenure protections of the agencies' ALJs render them insufficiently accountable to the President, in violation of separation-of-powers principles." *Axon*, 598 U.S. at 175. But this is not the claim over which the court lacks subject matter

jurisdiction. Although both claims, Plaintiff's due process claim and nondelegation doctrine claim, concern Defendants' board membership, the claims are distinct. And that distinction matters in terms of the court's subject matter jurisdiction.

Thus, the court is not persuaded by Plaintiff's argument that because the structural constitutional claim and the due process claim both concern Defendants' board, the claims are one and the same. Rather, they are two separate and distinct claims. "Subject matter jurisdiction . . . must be established in every cause under review in the federal courts." *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015). Therefore, the court must establish jurisdiction over *each* individual claim, not a combination of claims, before proceeding to the merits.

Plaintiff also argues that *Axon* requires the court to consider its due process claim, but this argument flips the holding on its head. Indeed, *Axon* reaffirmed the court's earlier holding in *Thunder Basin* that a due process claim falls within the jurisdictional exclusion. *Axon* did not change the law. It revalidated the factors set forth in *Thunder Basin* and explained why a due process claim differs from a structural constitutional claim in terms of jurisdiction.

In applying the *Thunder Basin* factors, the court again determines that it does not have subject matter jurisdiction to evaluate Plaintiff's due process claim. First, applying the jurisdiction exclusion would not "foreclose all meaningful judicial review." *Thunder Basin*, 510 U.S. at 212-13. As *Axon* and *Thunder Basin* courts both noted, the court of appeals can adequately address Plaintiff's due process claim after SEC review. *Axon Enter.*, 598 U.S. at 185; *Thunder Basin*, 510 U.S. at 215. Second, Plaintiff's challenge of Defendants' disciplinary proceedings is not "wholly collateral to [the Exchange Act's] review provisions." *Thunder Basin*, 510 U.S. at 212. Finally, even if Defendants' adjudicatory panel and the SEC have no expertise

9

in addressing this kind of due process claim, "constitutional claims [] can be meaningfully addressed in the Court of Appeals." *Id.* at 215.

As this court previously noted, "the nature of constitutional claims asserted is of great significance in jurisdictional determinations." Order Denying TRO at 10. And the court again concludes that it does not have subject matter jurisdiction over Plaintiff's due process claim. Thus, the court GRANTS Defendants' motion as to Plaintiff's fourth claim (due process) for lack of jurisdiction.

## II.    APPOINTMENTS CLAUSE AND SEPARATION-OF-POWERS

Next, Defendants argue that Plaintiff's first and second claims should be dismissed because Plaintiff fails to demonstrate that NSCC is a governmental entity for purposes of its structural constitutional challenges. To determine whether a party is a governmental entity subject to the Appointments Clause and separation-of-powers doctrine, courts consider the three factors from the Supreme Court's decision in *Lebron v. National Railroad Passenger Corporation*. *See DOT v. Ass'n of Am. R.R.*, 575 U.S. 43, 55 (2015) (applying the *Lebron* factors to conclude that Amtrak is a governmental entity for purposes of determining separation-of-powers and Appointments Clause challenges).

Where "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation," the party is a governmental entity subject to constitutional constraints. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 400 (1995). All factors set forth in *Lebron* must be met for the court to conclude a party is a government entity. *See e.g.*, *Herron v. Fannie Mae*, 861 F.3d 160, 1 (D.C. Cir. 2017) (holding that Fannie Mae was not a government entity even though it was created by Congress to accomplish government objectives because "the

10

conservatorship over Fannie Mae did not create the type of permanent government control that is required under *Lebron*").

In reviewing the *Lebron* factors, the court concludes Defendants are not governmental entities. First, Defendants were not created by the government. They were created by private financial market participants to facilitate clearance and settlement of security transactions. Second, although clearing agencies do serve a larger public purpose such as risk-mitigation, they were not created for the primary purpose of serving a government objective. Instead, these entities were formed to serve private market actors by clearing and settling their transactions. Finally, the government does not retain authority to appoint any of the Defendants' directors, let alone a majority of them. Unlike Amtrak, clearing agencies were not "established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees." *Ass'n of Am. R.R.*, 575 U.S. at 54.

Plaintiff does not present its argument within this legal framework, but instead asserts that its structural constitutional challenges apply to Defendants because they wield "significant executive power" and engage in state action. But this is not the test for Plaintiff's separation-of-powers or Appointments Clause claims. The Supreme Court has repeatedly reaffirmed the application of the *Lebron* factors to claims involving structural constitutional challenges, particularly ones involving claims under the Appointments Clause. *See, e.g.*, *Ass'n of Am. R.R.*, 575 U.S. at 53 (2015); *Free Enter.*, 561 U.S. at 486.

Thus, in failing to adequately allege that Defendants are a government entity, Plaintiff fails to a state a legally sufficient claim under the separation-of-powers doctrine or the Appointments Clause. The court therefore GRANTS Defendants' motion with respect to Plaintiff's first (separation-of-powers doctrine) and second (Appointments Clause) claims.

11

### III.    NONDELEGATION DOCTRINE

Defendants also argue that Plaintiff fails to state a claim under the nondelegation doctrine. The nondelegation doctrine arises from Article I of the Constitution, which provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art I., § 1. Most nondelegation claims challenge instances of Congress delegating its legislative powers to another branch of government, typically agencies in the executive branch. Here, Plaintiff claims that Congress has unconstitutionally delegated its legislative powers to private corporations, clearing agencies.

Delegation itself is not necessarily unconstitutional. In delegating legislative authority, Congress need only articulate an "intelligible principle." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001).  Because the standard is such a low bar for Congress to achieve, most nondelegation challenges fail. *See Gundy v. United States*, 588 U.S. 128, 212 (2019) (quoting *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989)) ("Only twice in this country's history has the Court found a delegation excessive, in each case because Congress had failed to articulate any policy or standard to confine discretion. By contrast, the Court has over and over upheld even very broad delegations." (internal quotation marks omitted)).

Here, the Exchange Act directs the SEC "to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities." 15 U.S.C. § 78q-1(a)(2)(A)(i). This language is more than adequate to meet the tremendously low hurdle for Congress to clear. *See* Gundy, 588 U.S. at 146 (collecting cases in which the Supreme Court has found an intelligible principle where Congress directs agencies to "regulate in the public interest," "set fair and equitable prices," set "just and reasonable rates," and "issue whatever air quality standards are requisite to protect the public health."). But even if the

Exchange Act does not articulate an "intelligible principle," Defendants are not governmental entities subject to structural constitutional challenges. Thus, the nondelegation doctrine does not apply to them.

Plaintiff responds that Defendants' regulatory and enforcement powers violate the private nondelegation doctrine. Under this doctrine, "a private entity may wield government power only if it functions subordinately to an agency with authority and surveillance over it." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 423 (5th Cir. 2024); *see also Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940); *Consumers' Rsch. v. FCC*, 88 F.4th 917, 926 (11th Cir. 2023); *Pittson Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004); *United States v. Frame*, 885 F.2d 1119, 1128 (3d Cir. 1989). This requires that the private entity "act only as an aid to an accountable government agency that retains the ultimate authority to approve[], disapprove[], or modif[y] the private entity's actions and decisions on delegated matters." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1325 (D.C. Cir. 2024).

Here, clearing agencies function subordinately to the SEC, and the SEC retains authority over clearing agencies by overseeing their rules, adjudicatory decisions, and registration. The SEC must approve any rule promulgated by a clearing agency before its implementation, including the ENC Rule at issue in this case. And, as Plaintiff well knows because Alpine requested it, the SEC may also review any adjudicatory action taken by a clearing agency, including disciplinary proceedings. Indeed, courts have long upheld the SEC-SRO model because SROs "exercise authority subject to SEC oversight" and "have no authority to regulate independently of the SEC's control." *NASD v. SEC*, 431 F.3d 803, 811 (D.C. Cir. 2005); *see also R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *Todd & Co. v. SEC*, 557 F.2d

13

1008, 1012–13 (3d Cir. 1977); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979);

*Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982).

Plaintiff points to the Fifth Circuit decision in *National Horsemen's Benevolent &
Protective Association v. Black (Horsemen's II)*, arguing that the holding applies to Defendants'
unchecked enforcement power. 107 F.4th 415 (5th Cir. 2024). Like unconstitutional delegations
of legislative power, "the private nondelegation doctrine forbids unaccountable delegations of
executive power." *Id.* at 428. In *Horsemen's II*, the Fifth Circuit held that the Horseracing
Integrity and Safety Act's enforcement provisions violated the private nondelegation doctrine
because they empowered a private entity, the Horseracing Integrity and Safety Authority ("the
Authority"), "to investigate, issue subpoenas, conduct searches, levy fines, and seek
injunctions—all without the FTC's say-so." *Id.* at 420.

Plaintiff argues that Defendants wield the same enforcement power without SEC
oversight. But unlike the Authority in *Horsemen's II*, Defendants do not have the responsibility
under the Act to "investigate potential violations" of the Act, "levy[] sanctions," or "bring[] suit
against violators for injunctive relief or to enforce sanctions." *Id.* at 429. Rather, Defendants'
enforcement actions concern their own rules for their members. They do not enforce the
Securities and Exchange Act or any other federal law. And even if they did, the Fifth Circuit
distinguished the Authority from SROs, such as the Financial Industry Regulatory Authority
("FINRA"), that assist the SEC in enforcing securities law. The Fifth Circuit concluded that "the
SEC retains formidable oversight power to supervise, investigate, and discipline [FINRA] for
any possible wrongdoing or regulatory missteps." *Id.* at 435. And the same oversight, if not
more, applies to clearing agencies. Because the clearing agencies have neither the lack of

oversight nor the executive power as the Authority in *Horsemen's II*, the court finds Plaintiff's argument unpersuasive.

Plaintiff also cites the recent decision in its case against FINRA to support its private nondelegation doctrine claim. In *Alpine Securities Corporation v. Financial Industry Regulatory Authority*, the D.C. Circuit held that FINRA is likely to have violated the private nondelegation doctrine when it initiated expedited disciplinary proceedings against Alpine that could result in the expulsion of Alpine from FINRA. 121 F.4th 1314, 1325 (D.C. Cir. 2024). Because federal law requires broker-dealers to be members of FINRA, expulsion could effectively ban Alpine from the securities industry. Further, FINRA was able to do so before the SEC could review its decision. "The result of this regulatory scheme is that FINRA can, without any SEC review of its decision on the merits, effectively decide who can trade securities under federal law." *Id.* at 1238. Thus, the D.C. Circuit found that Alpine would likely succeed on the merits of its private nondelegation doctrine claim against FINRA.

But this case is distinguishable for two reasons. First, the proceedings at issue before the court are not expedited. The D.C. Circuit specifically noted that its holding does not apply to cases in which an SRO can "delay the effectiveness of its expulsion orders . . . ." or where the SEC has "authority to lower its stay standard in expulsion cases." *Id.* at 1331. Here, Plaintiff was notified of Defendants' decision to cease to act for it in November 2023. Four months later, Defendants affirmed their decision after their own internal review, which included a hearing. Defendants then allotted Plaintiff thirty days before implementation of the order so that Plaintiff could seek review from the SEC. During this time, Plaintiff requested review by the SEC and a stay pending the SEC's review of Defendants' determination. The SEC granted an administrative stay pending review of the motion to stay. Thus, Defendants' decision to cease to act for Plaintiff

15

did not take immediate effect before SEC review. Unlike the *FINRA* case, Plaintiff has not shown on the record that clearing agency cease to act orders "take effect immediately, before the SEC can review them." *Id.* at 1326.

Second, although broker-dealers are required by federal law to register with FINRA, they are not required to be members of clearing agencies. Plaintiff claims that, because Defendants have "acquired a virtual monopoly over the clearing and settlement process," a termination of their membership in NSCC is tantamount to a corporate death sentence. Pl.'s Am. Compl. ¶ 7; *see also* ECF No. 69 ("Pl.'s Opp.") at 10.

But Defendants are not the only clearing agencies registered with the SEC. Thus, Defendants' decision to cease to act for Plaintiff does not have the same legal effect as FINRA's expulsion decision. Plaintiff may still legally participate in the securities industry even if that participation is, as a matter of operation or function, difficult. Unlike FINRA, Defendants alone do not "effectively decide who can trade securities under federal law." *Id.* at 1328. Therefore, the court finds the *FINRA* case to be distinguishable from the facts of this case and declines to apply the D.C. Circuit's holding here.

Plaintiff's claim under the private nondelegation doctrine fails to demonstrate that clearing agencies wield governmental power without SEC oversight. Unquestionably, Defendants act only as an aid to and function subordinately to the SEC. The Commission retains ultimate authority over Defendants' rule promulgation, adjudicatory decisions, and ultimately, their existence as the SEC can approve or revoke their registrations. Because Plaintiff fails to assert a legally sufficient claim under the nondelegation doctrine, the court GRANTS Defendants' motion on Plaintiff's third claim (nondelegation doctrine).

## CONCLUSION AND ORDER

For the reasons above, the court finds it does not have subject matter jurisdiction to adjudicate Plaintiff's fourth claim under the Due Process Clause. The court also finds that Plaintiff fails to state a claim under the Appointment Clause, separation-of-powers doctrine, and nondelegation doctrine. Thus, the court GRANTS Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiff's due process claim is DISMISSED WITHOUT PREJUDICE. Plaintiff's remaining claims under the separation-of-power doctrine, Appointments Clause, and nondelegation doctrine are DISMISSED WITH PREJUDICE.

DATED March 25, 2025

BY THE COURT

Jill N. Parrish
United States District Court Judge

# ATTACHMENT B

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, a Utah corporation,<br><br>        Plaintiff,<br><br>v.<br><br>NATIONAL SECURITIES CLEARING CORPORATION, THE DEPOSITORY TRUST & CLEARING CORPORATION, and THE DEPOSITORY TRUST COMPANY,<br><br>        Defendants,<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant-Intervenor. | **JUDGMENT IN A CIVIL CASE**<br><br>Case No. 2:23-cv-00782-JNP-JCB<br><br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Jared C. Bennett |

IT IS ORDERED AND ADJUDGED that Plaintiff's action is dismissed. Plaintiff's due process claim is DISMISSED WITHOUT PREJUDICE. Plaintiff's remaining claims under the separation-of-power doctrine, Appointments Clause, and nondelegation doctrine are DISMISSED WITH PREJUDICE.

        DATED March 25, 2025

                BY THE COURT

                _____
                Jill N. Parrish
                United States District Court Judge