**Case No. 25-4050**

*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

ALPINE SECURITIES CORPORATION,
a Utah corporation,
*Plaintiff-Appellant,*

v.

NATIONAL SECURITIES CLEARING CORPORATION, THE DEPOSITORY TRUST & CLEARING CORPORATION and DEPOSITORY TRUST COMPANY,
*Defendants-Appellees,*

UNITED STATES OF AMERICA,
*Defendant Intervenor-Appellee.*

*Appeal from a Decision of the United States District Court for the District of Utah - Salt Lake City*
*Case No. 2:23-CV-00782-JNP · Honorable Jill N. Parrish, U.S. District Judge*

# ANSWERING BRIEF

MARK D. HARRIS
MARGARET A. DALE
PROSKAUER ROSE
Eleven Times Square
New York, New York 10036
(212) 969-3000
mharris@proskauer.com
mdale@proskauer.com

ADAM DEMING
PROSKAUER ROSE
One International Place
Boston Massachusetts 02110
(617) 526-9600
ademing@proskauer.com

*Attorneys for Appellees National Securities Clearing Corporation, The Depository Trust Company and The Depository Trust & Clearing Corporation*

**ORAL ARGUMENT REQUESTED**

COUNSEL PRESS INC. · (213) 680-2300 PRINTED ON RECYCLED PAPER

# TABLE OF CONTENTS

**Page**

PRIOR OR RELATED APPEALS ........ xi

GLOSSARY OF ABBREVIATIONS ........ xii

PRELIMINARY STATEMENT ........ 1

JURISDICTIONAL STATEMENT ........ 6

STATEMENT OF ISSUES ........ 6

STATEMENT OF THE CASE ........ 7

A. NSCC's and DTC's Roles as Private Clearing Agencies ........ 7

1. The History of NSCC and DTC ........ 7

2. NSCC's and DTC's Responsibilities ........ 9

B. SEC Oversight of Registered Clearing Agencies ........ 10

C. The CTA Proceeding Against Alpine ........ 12

1. Categories of Members of Clearing Agencies ........ 12

2. Alpine Securities Corporation ........ 13

3. NSCC's Minimum Excess Net Capital (ENC) Requirement and Alpine's Failure to Comply and Dishonesty ........ 14

4. The CTA Proceedings ........ 16

D. Procedural History of This Action ........ 18

SUMMARY OF THE ARGUMENT ........ 20

STANDARD OF REVIEW ........ 22

ARGUMENT ........ 23

I. The District Court Correctly Dismissed Alpine's Due Process Claim for Lack of Jurisdiction ........ 23

II. The District Court Correctly Dismissed Alpine's Amended Complaint for Failure to State a Claim....27

A. Alpine's Structural Constitutional Challenges Fail Because The Clearing Agencies Are Private, Non-Governmental Entities....27

1. The Clearing Agencies Are Private Entities Under *Lebron*....27

2. The Court Should Reject Alpine's Invitation to Adopt a New State-Action Test for Structural Constitutional Claims....32

B. The Private Non-Delegation Claim Fails Because There Is No Unconstitutional Delegation Here....36

1. Alpine's Challenge to the Clearing Agencies' Delegated Authority to Promulgate Rules Fails....39

2. Alpine's Challenge to the Clearing Agencies' Adjudicatory Authority Fails....42

C. Alpine's Due Process Allegations Fail to State a Claim....49

1. Alpine Fails to Establish State Action....49

2. Alpine's Due Process Claim Fails on the Merits Because NSCC's and DTC's Rules Provide a Fair Procedure....54

D. In All Events, the Court Should Affirm the Dismissal of All Claims As Against DTCC....55

CONCLUSION....56

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alpine Sec. Corp. v. FINRA*,
2021 U.S. Dist. LEXIS 170482 (D. Utah Sept. 7, 2021)....................................24

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024)...........................................33-34, 42-44, 46-48

*Anderson v. Kitchen*,
389 F. App'x 838 (10th Cir. 2010) .................................................................32

*Ass'n of Am. R.R. v. U.S. Dep't of Transp.*,
821 F.3d 19 (D.C. Cir. 2016).........................................................................30

*Axon Enterprise, Inc. v. FTC*,
598 U.S. 175 (2023)........................................................... 4, 6, 20, 23-27

*Beedle v. Wilson*,
422 F.3d 1059 (10th Cir. 2005) .....................................................................50

*Bernstein v. Lind-Waldock & Co.*,
738 F.2d 179 (7th Cir. 1984) ....................................................................7, 51

*Blount v. SEC*,
61 F.3d 938 (D.C. Cir. 1995).........................................................................54

*Bradford Nat'l Clearing Corp. v. SEC*,
590 F.2d 1085 (D.C. Cir. 1978)........................................................................8

*Brentwood Acad.v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001)........................................................................................52

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*,
861 F.3d 1081 (10th Cir. 2017) .....................................................................22

*Collins v. Yellen*,
594 U.S. 220 (2021)........................................................................................33

*D'Alessio v. SEC*,
380 F.3d 112 (2d Cir. 2004) ...........................................................................54

*D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*,
279 F.3d 155 (2d Cir. 2002) ....................................................................50, 51

*Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015)......................................................................................30

*Desiderio v. NASD, Inc.*,
191 F.3d 198 (2d Cir. 1999) ....................................................................28, 50

*Epstein v. SEC*,
416 F. App'x 142 (3d Cir. 2010) ...........................................................28, 50, 54

*FCC v. Consumers' Research*,
145 S. Ct. 2482 (2025)........................................... 3-4, 21, 34, 36-40, 45, 48-49

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
590 U.S. 448 (2020)................................................................... 28, 32-33

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)................................................................... 27, 29-30

*Gallagher v. Neil Young Freedom Concert*,
49 F.3d 1442 (10th Cir. 1995) ................................................................. 50-51

*Galuska v. N.Y. Stock Exch.*,
2000 WL 347851 (7th Cir. Apr. 3, 2000).........................................................28

*General Bond & Share Co. v. SEC*,
39 F.3d 1451 (10th Cir. 1994) ......................................................................53

*Hennessey v. Univ. of Kan. Hosp. Auth.*,
53 F.4th 516 (10th Cir. 2022) ......................................................................23

*Horseracing Integrity & Safety Auth., Inc. v. Nat'l Horsemen's Benevolent & Protective Ass'n*,
No. 24-429, 2025 WL 1787684 (U.S. June 30, 2025).......................................40

*Johnson v. Rodrigues*,
293 F.3d 1196 (10th Cir. 2002) .....................................................................51

*Jones v. SEC*,
115 F.3d 1173 (4th Cir. 1997) ......................................................................28

*Kerpen v. Metro. Wash. Airports Auth.*,
907 F.3d 152 (4th Cir. 2018) ....................................................................30

*Kim v. FINRA*,
698 F. Supp. 3d 147 (D.D.C. 2023)................................................ 7, 28, 31-32

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995)........................................................... 7, 20, 23, 27, 29-33

*Lucia v. SEC*,
585 U.S. 237 (2018)............................................................................ 29, 33-34

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982)...............................................................................32, 50

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019)......................................................................................51

*McCune v. SEC*,
672 F. App'x 865 (10th Cir. 2016) ..............................................................28

*N.B. ex rel. Peacock v. District of Columbia*,
794 F.3d 31 (D.C. Cir. 2015)........................................................................35

*Nat'l Ass'n of Sec. Dealers, Inc. v. SEC*,
431 F.3d 803 (D.C. Cir. 2005)......................................................................54

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black (Horsemen's II)*,
107 F.4th 415 (5th Cir. 2024) .........................................................39-40, 46-48,

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black ("Horsemen's I")*,
53 F.5th 869 (5th Cir. 2022) .........................................................................39

*Oklahoma v. United States*,
62 F.4th 221 (6th Cir. 2023) ..............................................28, 38-40, 42, 46-49

*Oklahoma v. United States*,
No. 23-402, 2025 WL 1787679 (U.S. June 30, 2025)......................................40

*Perpetual Secs., Inc. v. Tang*,
290 F.3d 132 (2d Cir. 2002) .........................................................................50

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*,
559 F.3d 772 (8th Cir. 2009) ......................................................................9, 31

*Rooms v. SEC*,
444 F.3d 1208 (10th Cir. 2006) ....................................................................53

*Smith v. FINRA*,
2025 WL 985447 (D.D.C. Apr. 2, 2025)..........................................................42

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940)..................................................................34, 37, 49

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994)................................................................... 25-26

*Todd & Co. v. SEC*,
557 F.2d 1008 (3d Cir. 1977) ......................................................................47

*U.S. ex rel. Stone v. Rockwell Int'l Corp.*,
282 F.3d 787 (10th Cir. 2002) ......................................................................34

*United States v. Ackerman*,
831 F.3d 1292 (10th Cir. 2016) ....................................................................33

*United States v. Fortney*,
772 F. App'x 269 (6th Cir. 2019) ..................................................................35

*United States v. Hartwell*,
73 U.S. 385 (1867)..........................................................................................29

*Wasatch Equal. v. Alta Ski Lifts Co.*,
820 F.3d 381 (10th Cir. 2016) ......................................................................51

*Watkins v. Genesh, Inc.*,
135 F.4th 1224 (10th Cir. 2025) ............................................... 49, 55-60

*Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*,
539 F.3d 1159 (9th Cir. 2008) ................................................................ 52-53

*Wittner v. Banner Health*,
720 F.3d 770 (10th Cir. 2013) ......................................................................51

*Yates v. United States*,
574 U.S. 528 (2015) ........................................ 29

**STATUTES AND CONSTITUTIONS**

12 U.S.C. § 5323 ........................................ 11

15 U.S.C. § 78a *et seq.* ........................................ 7

15 U.S.C. § 78f ........................................ 41

15 U.S.C. § 78o ........................................ 41, 43, 46

15 U.S.C. § 78q-1 ........................................ 8, 10-12, 26, 31, 38, 40, 55

15 U.S.C. § 78s ........................................ 6, 10-12, 18, 24, 26, 34, 38, 40-42, 45-48

15 U.S.C. § 78y ........................................ 5-6, 12, 24, 26, 38,

15 U.S.C. § 3058 ........................................ 47

28 U.S.C. § 1292 ........................................ 6

U.S. Const. art. II, § 2, cl. 2 ........................................ 28

**REGULATIONS & RULES**

17 C.F.R. § 240.17Ad-22(e) ........................................ 8

17 C.F.R. § 240.19b-4(f) ........................................ 11

17 C.F.R. § 240.19d-1(c)(1) ........................................ 12

DTC R. 2 §§ 1, 10 ........................................ 10

DTC R. 22 ........................................ 16, 55

NSCC R. 2C ........................................ 10

NSCC R. 4 & Proc. XV ........................................ 9-10

NSCC R. 15 ........................................ 10

NSCC R. 37 ........................................ 16, 55

NSCC R. 48 ..... 16

**OTHER AUTHORITIES**

Administrative Stay, *In re Alpine Secs. Corp.*,
Admin. Proc. No. 3-21924, Release No. 100128 (May 14, 2024) ..... 18, 44

*Clearing Agency Governance and Conflicts of Interest*,
88 Fed. Reg. 84,454 (Dec. 5, 2023) ..... 41

*Clearing Agency Standards*,
77 Fed. Reg. 66,220 (Nov. 2, 2012) ..... 41

*In re Applications of Edward Beyn & Craig S. Taddonio,*
SEC Admin. Proc. Nos. 3-19007, 3-19012, 2023 WL 3017562
(Apr. 19, 2023) ..... 26

*In re Application of Joseph G. Chiulli*,
SEC Admin. Proc. No. 3-9776, 2000 WL 91733 (Jan. 28, 2000) ..... 26

*In re Application of KJM Secs. for Review of Disciplinary Action Taken by FINRA*,
SEC Release No. 23-88053, 2020 WL 416696 (Jan. 27, 2020) ..... 45

Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70
Stan. L. Rev. 443, 471 (2018) ..... 29

*Notice of Filing of Proposed Rule to Enhance Capital Requirements and Make Other Changes*,
Release No. 34-93856, 86 Fed. Reg. 74,185 (Dec. 22, 2021) ..... 14

*Officers of the U.S. Within the Meaning of the Appointments Clause*,
DOJ Off. Legal Counsel, 2007 WL 1405459 (Apr. 16, 2007) ..... 33

*Order Approving of Proposed Rule Change to Enhance Capital Requirements and Make Other Changes*,
SEC Release No. 34-95618, 87 Fed. Reg. 53,796 (Aug. 26, 2022) ..... 13-15

*SEC Concept Release Concerning Self-Regulation*,
Release No. 34-50700, 69 Fed. Reg. 71,256 (Dec. 8, 2004) ..... 7, 31

*Standards for Covered Clearing Agencies*,
81 Fed. Reg. 70,786 (Oct. 13, 2016) ..... 11, 41

## PRIOR OR RELATED APPEALS

In accordance with 10th Cir. R. 28.2(C)(3), Appellees identify one prior appeal in this case: *Alpine Securities Corp. v. Nat'l Securities Clearing Corp.*, Appeal No. 24-4027. In that appeal, Appellant challenged the district court's denial of its prior motion for a temporary restraining order and preliminary injunction. *See* Case No. 2:23-cv-00782-JNP, Dkt. No. 51 (D. Utah Mar. 8, 2024). On April 10, 2025, following briefing and oral argument, this Court dismissed that appeal as moot in light of the district court's order dismissing the case below (which is the subject of the present appeal). *See* Appeal No. 24-4027, Dkt. No. 98.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| CTA | Cease to Act |
| DTC | The Depository Trust Company |
| DTCC | Depository Trust and Clearing Corporation |
| ENC | Excess Net Capital |
| FINRA | Financial Industry Regulatory Authority |
| HISA | Horseracing Integrity and Safety Act |
| NASD | National Association of Securities Dealers |
| NSCC | National Securities Clearing Corporation |
| NYSE | New York Stock Exchange |
| OLC | Office of Legal Counsel, U.S. Department of Justice |
| SEC | U.S. Securities and Exchange Commission |
| SIFMU | Systemically Important Financial Markets Utility |
| SRO | Self-Regulatory Organization |

## PRELIMINARY STATEMENT

This appeal is the latest in a long line of challenges brought by Alpine Securities Corporation to evade the consequences of its dishonesty and misconduct. Alpine brings the same sweeping attacks on the constitutionality of the defendant clearing agencies' structures and procedures—and more broadly on the securities industry's long-established self-regulatory system—that it has presented repeatedly before the SEC, the district court below, and this Court. Its arguments are as meritless this time as in their previous iterations.

Alpine is a member of the National Securities Clearing Corporation ("NSCC") and The Depository Trust Company ("DTC," and together with NSCC, the "Clearing Agencies"), two private, non-governmental entities that jointly clear and settle most of the securities transactions that occur in this country. The Clearing Agencies facilitate and guarantee these transactions, including payment and delivery between Member Firms. They also serve a crucial risk-management function, protecting counterparties and the market as a whole from various types of financial risk.

In August 2022, new minimum cash-reserve requirements (referred to as Excess Net Capital or "ENC" requirements) for Clearing Agency members were approved by the SEC, to take effect a year later. By October 2023, every member of NSCC and DTC except for one—Alpine—had complied with those requirements. Alpine not only deliberately flouted the new rule, but lied to the Clearing Agencies

to hide its violations. When the Clearing Agencies found out, pursuant to their duty to manage risk for all Members, they gave notice that they would terminate Alpine's membership—a measure known as a "Cease to Act" ("CTA").

Anticipating this reaction, Alpine preemptively launched a scorched-earth litigation campaign against the Clearing Agencies just days before its deception was discovered. First, it started the litigation in the court below, lobbing broad-based attacks on the constitutionality of self-regulatory organizations ("SROs") within the securities industry, including the Clearing Agencies. Then, after receiving notice of the CTA and a hearing date with a hearing panel, it moved unsuccessfully for a TRO and preliminary injunction to block the CTA proceedings. It brought an interlocutory appeal of the denial before this Court, which was fully briefed and argued. That appeal was ultimately mooted when the district court dismissed the case. That decision is the subject of the present appeal.

While these proceedings were unfolding, Alpine also participated in the CTA hearing, and then appealed the Hearing Panel's adverse determination to the SEC, where it sought a stay of implementation of the CTA pending SEC review. The SEC issued an administrative stay to give itself additional time to carefully consider Alpine's stay motion. That administrative stay has now been in effect for over a year.

In the present appeal, Alpine once more raises all the same constitutional arguments. It contends that the Clearing Agencies violate the structural provisions of

Article II of the U.S. Constitution, specifically the Appointments Clause and the separation of powers doctrine. That argument is a non-starter, however, because those constitutional principles concern the structure of the federal government, not private entities like the Clearing Agencies. Indeed, clearing agencies in this country have *always* been private entities, going back to the time they were established by equally private exchanges. Alpine suggests that the Court should adopt a novel test for the application of Article II requirements—namely, whether NSCC and DTC engage in "state action" or, even more nebulously, in the exercise of "significant executive authority." They do neither. But more fundamentally, there is no precedent for Alpine's proposed approach; it would throw settled doctrine into disarray and lead to bizarre and inconsistent consequences. The board members of the Clearing Agencies are not "Officers of the United States."

Alpine's other arguments about private non-delegation and due process are similarly unpersuasive. As to the private non-delegation doctrine, Alpine's primary authorities have been vacated in the wake of the Supreme Court's recent decision in *FCC v. Consumers' Research*, 145 S. Ct. 2482 (2025). Even if those decisions were later reinstated by their respective circuits, they would pose no impediment to (and in fact support) the district court's dismissal of Alpine's complaint below, as this Court agreed when it denied Alpine's request for a stay pending the prior appeal.

*Consumers' Research* only strengthens the Clearing Agencies' position. Under the simple rule reaffirmed there, the Clearing Agencies pass muster because they are subordinate to and under the "authority and surveillance" of a federal agency, the SEC. Indeed, as Alpine's own authorities acknowledge, the statutory framework that governs the Clearing Agencies is frequently touted as the exemplar for constitutional delegations of power. The SEC approved the ENC rule change at issue here before it took effect. The SEC is also considering Alpine's petition for review of the CTA proceedings and motion to stay implementation of the CTA pending appeal, all in advance of enforcement.

Alpine's due process claim meets a similar fate. Under *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), the limited jurisdictional grant to bring broad, existential constitutional challenges to agencies before a federal district court does not extend to such claims. Further, by any test recognized in this Circuit, the Clearing Agencies are not engaged in state action, the prerequisite to trigger due-process rights. And the facts that Alpine alleged—amounting to threadbare accusations of bias—do not support its substantive claim.

Notwithstanding its complaints about a supposed lack of process, Alpine has already managed to press these same arguments in five forums, with no sign of slowing down.[1] Alpine has not merely received a second bite at the apple; it has devoured it to the core. All the while, to this very day, Alpine has remained and continues to do business as a Clears for Others Member of the Clearing Agencies, with the Clearing Agencies and the other Members continuing to bear risk due to Alpine's deceptions and misdirection. Just as the district court has done twice now, and this Court once before, the Court should again reject Alpine's scattershot, ill-conceived constitutional claims. Alpine has escaped the consequences of its deceptive and risky behavior as a Member of the Clearing Agencies for long enough.

[1] In sequential order, Alpine has raised some version of these claims (1) on the merits in the proceeding below; (2) in its motion to enjoin Clearing Agency proceedings below; (3) in its motion to enjoin Clearing Agency proceedings pending its first appeal of the district court's order denying injunction; (4) in Clearing Agency proceedings; (5) in its motion to stay the Clearing Agency Hearing Panel's decision before the SEC; and (6) in the present appeal of the district court's merits determination. After this appeal is resolved, presumably, Alpine will (7) pursue its challenges on the merits in the SEC's review of the Hearing Panel's decision; and (8) appeal any adverse merits determination by the SEC to a Court of Appeals under 15 U.S.C. § 78y(a). Notably, this list does not include the prior appeal before this Court—which the parties briefed and argued before it was mooted by the district court's issuance of a final decision—and the possibility that Alpine will also seek a stay of disciplinary measures pending any appeal it pursues under 15 U.S.C. § 78y(a).

## JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) for most of Alpine's claims. It has subject matter jurisdiction over Alpine's Appointments Clause, separation of powers, and private non-delegation claims pursuant to *Axon*, which recognizes district-court jurisdiction over claims that would otherwise be subject to administrative review. *See* 15 U.S.C. § 78s(d)(1)–(2); *id.* § 78y(a). Those counts fit within *Axon's* narrow jurisdictional grant for "far-reaching constitutional claims" challenging "the structure or very existence of an agency." 598 U.S. at 185, 189.

As the district court correctly held, however, there is no subject matter jurisdiction over Alpine's due process claim. That claim challenges procedures applied in the SRO hearing, rather than the SRO's very structure or existence, and therefore falls outside *Axon's* narrow exception. Accordingly, this Court lacks jurisdiction over Alpine's due process challenge. *See* Point I.C.1, *infra*.

## STATEMENT OF ISSUES

1. Did the district court correctly dismiss Alpine's due process count for lack of subject matter jurisdiction because it is not a challenge to an agency's "structure or very existence" and is therefore outside the special jurisdictional grant recognized in *Axon Enterprise, Inc. v. FTC*?

2. Did the district court correctly dismiss Alpine's Article II Appointments Clause and separation of powers counts because NSCC and DTC are private firms that are not a part of the federal government under the test supplied by *Lebron v. National Railroad Passenger Corp.,* 513 U.S. 374 (1995)?

3. Did the district court correctly dismiss Alpine's private non-delegation count for failure to state a claim because NSCC and DTC do not exercise delegated governmental authority beyond the SEC's oversight?

## STATEMENT OF THE CASE

### A. NSCC's and DTC's Roles as Private Clearing Agencies.

#### *1. The History of NSCC and DTC.*

The securities industry in this country boasts a "long tradition" of private self-regulation. *Kim v. FINRA*, 698 F. Supp. 3d 147, 164 (D.D.C. 2023) (quotation marks and citation omitted). That tradition "preexisted federal regulation," *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 186 (7th Cir. 1984), and dates back to private brokers' establishment of exchanges in the 1700s, *see SEC Concept Release Concerning Self-Regulation*, Release No. 34-50700, 69 Fed. Reg. 71,256, 71,257 (Dec. 8, 2004) (hereinafter "SEC Concept Release"). Even with passage of the Exchange Act, 15 U.S.C. § 78a *et seq.*, which increased federal government oversight of SROs, the SRO model remained fundamentally private in nature, *see* SEC Concept Release, 69 Fed. Reg. at 71,257.

Clearing agencies, which clear and settle securities trades, originally began as private entities that handled the back-office functions of securities exchanges. In 1975, in response to Wall Street's "Paperwork Crisis," Congress amended the Exchange Act to provide for supervision of clearing agencies by the SEC. The 1975 amendments directed the SEC to facilitate the establishment of a national system for the "prompt and accurate clearance and settlement of transactions in securities," by registering and supervising private clearing agencies. 15 U.S.C. § 78q-1(a)(2)(A)(i), (e). Clearing agencies could register with the SEC, provided they could maintain various statutory and regulatory requirements, including being able to "facilitate the prompt and accurate clearance and settlement of securities transactions" and safeguard securities and funds in their custody. *Id.* § 78q-1(b)(3)(A); *see also* 17 C.F.R. § 240.17Ad-22(e).

In the 1970s, NSCC and DTC were established through the consolidation of three major exchanges' private clearing subsidiaries. NSCC first registered as a clearing agency and became an SRO under the Exchange Act in 1977. *See Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1090 (D.C. Cir. 1978) (citation omitted). DTC was formed in 1973 through a collaboration of New York's clearing house banks and other private SROs, including the New York Stock Exchange ("NYSE"), to create a depository for physical securities. Both NSCC and DTC are

wholly owned subsidiaries of DTCC, which in turn is owned by many non-governmental entities in the financial industry. *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.,* 559 F.3d 772, 776–77 (8th Cir. 2009).

### *2. NSCC's and DTC's Responsibilities.*

NSCC operates as a central counterparty for the U.S. securities markets, while DTC acts as the central securities depository. App.1.16 ¶¶ 5–6.[2] Together, they facilitate (and NSCC guarantees) the payment and delivery of cash and securities to private sellers and buyers in various kinds of securities transactions. *Id.* NSCC fulfills its role by standing in the middle of all securities transactions among its Members, assuming responsibility for receiving, delivering, and paying for securities and taking on the risk of Member default throughout the process. *See* App.1.24 ¶¶ 33–35; App.1.28–29 ¶¶ 55–56. DTC maintains an electronic ledger system that records all changes in its Members' ownership of securities on deposit at DTC. *See* App.1.24 ¶¶ 36–37; App.1.28–29 ¶ 56; *Pet Quarters*, 559 F.3d at 777.

In their respective roles, NSCC and DTC undertake critical risk-management functions. These include the enforcement of Member financial requirements, such as the maintenance of certain deposited funds and capital reserves, to ensure that Members can fulfill their outstanding trade obligations notwithstanding underlying credit, market, liquidity, and other risks. *See, e.g.*, App.1.126–33, 143–60 (NSCC

---

[2] Citations to the Appendix are abbreviated "App.[volume].[page]."

Rules & Procedures, R. 4 & Proc. XV).[3] Absent the Clearing Agencies' risk-management measures, in the event of Member default, the burden of covering the defaulting Member's open trades would fall squarely on other Members, creating the possibility of cascading defaults. Hence, the Clearing Agencies' risk-management requirements—including and especially individual member financial requirements—are critical. Accordingly, Members must report accurate and timely financial information to NSCC and DTC to ensure adequate risk controls. *See, e.g.*, App.1.113–17, 134–35 (NSCC R. 2C § 2, R. 15); App.1.182–87, 191–92 (DTC R. 2 §§ 1, 10).

### B. SEC Oversight of Registered Clearing Agencies.

As registered clearing agencies and SROs, NSCC and DTC are subject to extensive SEC regulation and oversight. *See* 15 U.S.C. §§ 78q-1, 78s. The SEC maintains stringent registration criteria and has the power to suspend or revoke clearing agencies' registrations based on those criteria or on their failure to comply with any other provision of the Exchange Act, the SEC's rules, or their own rules. *Id.* §§ 78q-1(b), 78s(h)(1). Among other registration criteria, NSCC and DTC must maintain

[3] All NSCC and DTC rules are available at https://www.dtcc.com/legal/rules-and-procedures.

membership standards sufficient to ensure the financial responsibility and operational capability of each Member to meet its obligations. *See id.* § 78q-1(b)(3)(F).[4]

NSCC and DTC must submit proposed rules for SEC review and public notice and comment. *See id.* § 78s(b)(1)–(3). With limited exceptions inapplicable here, *see* 15 U.S.C. § 78s(c)(3); 17 C.F.R. § 240.19b-4(f), clearing agency rules require SEC approval before taking effect. *Id.* The SEC has the power to prescribe rules and regulations specifically for clearing agencies "as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter." *Id.* § 78q-1(d)(1). The SEC can also compel clearing agencies to modify their own rules. *See, e.g.*, *Standards for Covered Clearing Agencies*, 81 Fed. Reg. 70,786, 70,788 & n.14, 70,800–70,801 (Oct. 13, 2016).

NSCC and DTC are authorized to take disciplinary action against a Member that violates their rules. The Exchange Act requires that they provide the Member notice and an opportunity to defend itself against the charges, and "fair procedures"

[4] NSCC and DTC have also been designated Systemically Important Financial Market Utilities ("SIFMUs") by the Financial Stability Oversight Council under the Dodd-Frank Act in recognition of the importance of their continued functioning to the United States financial system. *See* 12 U.S.C. § 5323(a). This designation subjects them to greater regulatory oversight, including increased reporting to supervising regulatory agencies for designated material-rule changes, additional risk-management standards, and more frequent examinations by regulating agencies. *See id.* §§ 5464(a)(2), 5465(e), 5466.

for such hearings. *See* 15 U.S.C. § 78q-1(b)(5), (b)(3)(H). When the hearing concludes, the Clearing Agencies must notify the SEC of any "final disciplinary sanction" against the Member. *Id.* § 78s(d)(1); 17 C.F.R. § 240.19d-1(c)(1). Any Member subject to an adverse decision may obtain SEC review of the action (or the SEC may review on its own initiative), 15 U.S.C. § 78s(d)–(f), and may further appeal any adverse SEC decision to a United States Court of Appeals, *id.* § 78y(a).

Notably, while the Exchange Act requires registered clearing agencies to enforce their own rules for Members, clearing agencies do not enforce the Exchange Act—a fact that distinguishes them from other securities SROs covered by the Act. *Compare id.* § 78s(g)(1)(C) (requiring a clearing agency to "enforce compliance . . . with its own rules by its participants") *with, e.g.*, *id.* § 78s(g)(1)(A) (requiring a national securities exchange, a different class of securities SRO, to "enforce compliance . . . with [] provisions [of this chapter] by its members and persons associated with its members"); *see also id.* § 78s(h)(1)(A)–(C), (h)(2)(A)–(C), (h)(4)(A)–(C).

### C. The CTA Proceeding Against Alpine.

#### *1. Categories of Members of Clearing Agencies*

Broker-dealer Members of NSCC fall into two categories. Some are "Clears for Others" Members, meaning that they submit trades to NSCC on behalf of other brokers with which they have a correspondent clearing relationship. App.1.35–37

¶¶ 82, 88; *Order Approving of Proposed Rule Change to Enhance Capital Requirements and Make Other Changes*, SEC Release No. 34-95618, 87 Fed. Reg. 53,796, 53,797 (Aug. 26, 2022) ("ENC Approval Order"). Others are "Self-Clearing" Members, meaning they submit their own trades to NSCC, but cannot submit trades on behalf of other brokers. Significantly, non-Members can still have their trades cleared through NSCC provided they submit those trades through a Clears for Others Member. Historically, Clears for Others Members have been held to higher minimum-capital standards to account for the greater risk they bear from the entities for which they clear. *See* ENC Approval Order at 53,797.

### *2. Alpine Securities Corporation*

Alpines Securities Corporation is a broker-dealer Member of NSCC and DTC. Since the outset of its membership, it has been a Clears for Others Member, clearing trades for itself and for its affiliate, Scottsdale Capital Advisors Corporation ("Scottsdale"), a sister entity owned by the same parent holding company. *See* App.1.23 ¶ 30, App.1.37 ¶ 88. Even before the events at issue here, Alpine had a heightened risk profile due to its credit risk and ongoing financial, operational, and

regulatory issues. *See, e.g.*, FINRA BrokerCheck Report for Alpine Securities Corporation, CRD # 14952.[5] (listing various regulatory events and civil actions Alpine disclosed to FINRA).

### *3. NSCC's Minimum Excess Net Capital (ENC) Requirement and Alpine's Failure to Comply and Dishonesty.*

One of NSCC's critical risk-management tools is the minimum ENC rule, which requires NSCC Members to hold sufficient capital to sustain unexpected or sustained increases in margin requirements, thereby protecting NSCC and other Members from losses resulting from defaults. *See Notice of Filing of Proposed Rule to Enhance Capital Requirements and Make Other Changes*, Release No. 34-93856, 86 Fed. Reg. 74,185, 74,186 (Dec. 22, 2021); App.1.161–64 (NSCC Rules, Add. B). In December 2021, NSCC submitted a proposed rule to the SEC to increase the minimum ENC requirements applicable to its broker-dealer Members, including Alpine. *See* ENC Approval Order at 53,797. Alpine objected to the rule during the public notice-and-comment period. *See* App.1.60; Jan. 19, 2022 Alpine Comment Ltr. to SEC Release No. 34-93856.[6] The SEC approved the rule on August 26, 2022, with

[5] *Available at* https://files.brokercheck.finra.org/firm/ firm_14952.pdf (last accessed Aug. 20, 2025)

[6] *Available at* https://www.sec.gov/comments/sr-nscc-2021-016/srnscc2021016-20112203-265295.pdf.

an effective date one year later and a grace period of an additional 60 days. *See* ENC Approval Order at 53,804; App.1.36 ¶ 83; App.1.60.

The new rule calculated each broker-dealer's required minimum ENC based on (i) whether the broker was a Self-Clearing or Clears for Others Member of NSCC, the latter having higher ENC requirements, and (ii) a daily measure of the volatility of the Member's trading activity, with higher volatility leading to a higher ENC requirement. App.1.162–64 (NSCC Rules, Add. B § 1.B.1). As a Clears for Others Member with volatility in the highest range, Alpine was required to maintain a minimum of $10 million in ENC. *See* ENC Approval Order at 53,797.

NSCC issued multiple communications to all Members regarding the new rule over the year and sixty days leading up to its implementation. *See* App.1.36 ¶ 86; Clearing Agencies' April 25, 2024 Hearing Panel Decision ("Hearing Panel Dec.") at 4.[7] Alpine expressly acknowledged its understanding that failure to comply in a timely manner—by October 25, 2023—could lead to NSCC ceasing to act. *Id.*

Despite corresponding with NSCC about this rule change for months, Alpine notified NSCC mere days before the grace period ended that it was considering changing its business model from Clears for Others to Self-Clearing to avoid the

---

[7] The Clearing Agencies' Hearing Panel decision in the CTA proceeding is publicly available on the SEC's website in SEC Admin. Proc. No. 3-21924, *available at* https://www.sec.gov/litigation/apdocuments/3-21924.

higher ENC requirement. *See* Hearing Panel Dec. at 9. NSCC responded that such a material change to Alpine's business would require detailed review by NSCC's risk team, which needed first to evaluate whether Alpine had the operational capabilities to sustain the new business model. *See id.* at 9–10. In the meantime, the $10 million requirement remained in effect. On October 25, 2023, the grace period expired.

During the same time period, the Clearing Agencies engaged in a series of written and oral communications with Alpine about its capital reporting and compliance with the $10 million ENC requirement. *Id.* at 7–14. In early November, the Clearing Agencies learned that Alpine was misrepresenting its available capital and had in fact been out of compliance for over two weeks. *Id.* at 15–17. Alpine was the only Member that did not comply with the requirement by the October 25, 2023 cut-off. *Id.* at 4.

#### *4. The CTA Proceedings.*

On November 9, 2023, NSCC and DTC sent notice of their intention to cease to act for Alpine because of its ENC non-compliance and subsequent misrepresentations. Alpine Br. Add. A (hereinafter "Add.") at 4–5; App.1.45 Alpine timely requested a hearing. App.1.46. The Clearing Agencies convened a panel of disinterested board members pursuant to their hearing rules (the "Hearing Panel"). *See* Add.5; App.1.136–39, 142 (NSCC R. 37, 48); App.1.201–03 (DTC R. 22).

The hearing was held on March 18 and March 19, 2024. The Hearing Panel received written testimony from three Alpine witnesses and two Clearing Agency witnesses, along with dozens of exhibits of documentary evidence. *See* Hearing Panel Dec. at 2. The same witnesses were subjected to live cross-examination. *Id.* After post-hearing briefing, the Hearing Panel issued its decision, upholding the Clearing Agencies' determinations to cease to act for Alpine.

The Hearing Panel found, among other things, that:

- Alpine was subject to the $10 million minimum ENC requirement as a Clears for Others Member because it was "unable to effectuate [] a change in clearing status by the Compliance Deadline";
- "Alpine was not in compliance with its ENC requirements";
- Alpine made "numerous misrepresentations" and "knowing obfuscation[s]" in its "specific representations to [the Clearing Agencies]" about capital; and
- Alpine understood it would be subject to regulatory action if it did not meet the ENC requirement.

*Id.* at 13, 16, 17, 18. Based on these findings, the Hearing Panel concluded that ceasing to act for Alpine was justified and consistent with the rules. In the Hearing Panel's view, the Clearing Agencies could not "be expected to allow a member that violates an important rule despite notice and then makes misrepresentations about its non-compliance to remain a member." *Id.* at 19.

Following the hearing, the Clearing Agencies agreed not to implement the CTA for at least thirty days to provide Alpine time to pursue SEC review. *See In re*

*Alpine Secs. Corp.*, Admin. Proc. File No. 3-21924, Release No. 100128, at n.2 (May 14, 2024) (the "Administrative Stay");[8] *accord* Alpine Br. 9. Alpine appealed to the SEC pursuant to 15 U.S.C. § 78s(d)(2) and simultaneously filed a motion for an emergency interim stay. After expedited briefing, the SEC issued a temporary, administrative stay to give itself "an opportunity to consider Alpine's motion for a stay," stating that the administrative stay "should not be construed in any way as ruling on the merits of that motion." *See* Administrative Stay. The administrative stay remains in effect, more than fifteen months later, and the SEC's decision on Alpine's motion is still pending.

### D. Procedural History of This Action.

On October 27, 2023, just two days after the ENC grace period ended and while Alpine was misrepresenting its available capital to the Clearing Agencies—but before the latter discovered the deception and took any action—Alpine initiated this suit against NSCC and DTCC (later adding DTC). *See* App.1.4; App.1.60. Evidently figuring that a good offense is the best defense, Alpine raised a slew of constitutional challenges under the Due Process Clause, the Appointments Clause, separation of powers, and the private non-delegation doctrine.

[8] *Available at* https://www.sec.gov/files/litigation/opinions/2024/34-100128.pdf.

In February 2024, Alpine moved for a temporary restraining order and a preliminary injunction to prevent DTCC and NSCC from pursuing the CTA proceedings. App.1.61. In a well-reasoned opinion, the district court denied the motion based on failure to show a likelihood of success on the merits. *See* App.1.56–74. Alpine appealed and sought an emergency injunction blocking CTA proceedings—including the hearing on March 18 and March 19, 2024—pending the appeal. A panel of this Court denied Alpine's motion, concluding that Alpine failed to meet its burden on the four-prong test for injunctive relief. *See* Order, Appeal No. 24-4027 (Mar. 15, 2024). Hence, the hearing went forward.

While Alpine's appeal of the TRO denial was pending, Alpine filed an amended complaint below. Defendants moved to dismiss. On March 25, 2025, the district court granted the motion and dismissed the action, rejecting all of Alpine's theories. *See generally* Add. The court held that it lacked subject matter jurisdiction over the due process claim because it had to be raised exclusively to the SEC. The district court likewise dismissed the Appointments Clause and separation of powers claims based on the Clearing Agencies' status as private, non-governmental organizations. And it dismissed the private non-delegation challenge, reasoning that the Clearing Agencies functioned subordinately to the SEC.

Following that decision, the Tenth Circuit dismissed Alpine's appeal of the Order Denying TRO as moot. *See* Order, Dkt. No. 98, Appeal No. 24-4027 (Apr. 10, 2025). Alpine then brought the instant appeal.

## SUMMARY OF THE ARGUMENT

The district court correctly dismissed each of Alpine's claims.

**I.** Alpine's due process claim fails on multiple grounds. It does not meet the threshold jurisdictional requirements under *Axon*, instead falling within the Exchange Act's provision channeling review of SRO actions to the SEC and depriving the district court of jurisdiction. But even if there were subject matter jurisdiction, the claim also fails on the merits. Alpine fails to show how the Clearing Agencies satisfy any established test for state action, preferring instead to cherry-pick sound-bites about state action from inapplicable cases. And Alpine rests on its conclusory allegations of bias by the Hearing Panel, ignoring cases rejecting similar challenges to the impartiality of other SRO hearing bodies, as well as the Clearing Agencies' specific rules designed to ensure hearing-panel impartiality.

**II**. Alpine's Appointments Clause and separation of powers claims fail because the Constitution's structural provisions do not apply to non-governmental parties. Under the test supplied by *Lebron,* private firms like NSCC and DTC are subject to Article II requirements only if in reality they function as part of the government. Alpine does not even attempt to satisfy this test. Instead, Alpine posits that

engaging in state action (or, even more nebulously, "wielding government power") is enough to make an entity subject to Article II constitutional requirements. That standard has no precedent in case law. Moreover, it would eviscerate the entire model of delegating executive authority to private actors so long as they have appropriate government supervision. Further, on Alpine's test, officials of private companies that have been held to perform state action in limited situations would suddenly require presidential appointment, a facially absurd result.

**III.** Alpine's private non-delegation theory likewise fails because any exercise of delegated governmental authority by the Clearing Agencies is conducted subordinately to and under the "authority and surveillance" of the SEC, rendering it constitutional. Relying mainly on cases that have been vacated in the wake of the Supreme Court's recent *FCC v. Consumers' Research* decision, Alpine argues that the SEC lacks the authority to alter the Clearing Agencies' rules. But the Exchange Act furnishes the SEC with plenary power to promulgate rules specifically for clearing agencies—a unique statutory power that is broader than the authority simply to amend SROs' internal rules. Alpine also ignores the breadth of the SEC's oversight regime for clearing agencies, which includes rigorous registration requirements, the power to suspend a clearing agency for all manner of rule violations, and review of enforcement actions.

Alpine's similar challenge to the Clearing Agencies' enforcement authority fares no better. Contrary to Alpine's suggestion, pre-enforcement review of sanctions is not required to comply with the private non-delegation doctrine. Nor is this case affected by the D.C. Circuit's recent, narrow ruling that an expedited FINRA action to expel Alpine from the securities industry as a matter of federal law—a severe and potentially irreversible sanction—required SEC review before taking effect. Here, the CTA does not entail an expulsion of Alpine from the securities industry. Alpine could continue operations by clearing its trades through another Member, as its own affiliate entity has done for years. Moreover, the CTA is not an exercise of delegated governmental authority like the FINRA expulsion order, which revoked the broker-dealer registration required by law for Alpine to remain in the securities industry. In any event, Alpine admits that it has been able to pursue SEC review here, and that it has obtained a stay of CTA implementation.

## **STANDARD OF REVIEW**

Dismissal of a complaint pursuant to Rule 12(b)(6) is reviewed de novo. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017). Dismissal is appropriate where, accepting the complaint's well-pleaded, non-conclusory factual allegations, it is legally insufficient to state a claim. *Id.* at 1104–05. Dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) is

likewise reviewed de novo, with any factual findings underlying the dismissal reviewed for clear error. *Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 527 (10th Cir. 2022).

## ARGUMENT

The district court correctly dismissed each of Alpine's claims. It lacked subject matter jurisdiction over Alpine's due process claim, which falls outside *Axon*'s jurisdictional grant for structural and existential claims against agencies. None of Alpine's constitutional counts states a claim on which relief can be granted. Its Appointments Clause and separation-of-powers claims fail under the Supreme Court's well-established government-entity test in *Lebron*. Alpine's private non-delegation claim fails because the Clearing Agencies are subordinate to and exercise any delegated authority solely under the supervision of the SEC. And even if there were jurisdiction over the due process claim, it would fail both because the Clearing Agencies are not engaged in state action and because the hearing procedures Alpine takes issue with do not offend due process.

### I. The District Court Correctly Dismissed Alpine's Due Process Claim for Lack of Jurisdiction.

The district court correctly concluded that it lacked subject matter jurisdiction over Alpine's due process claim. Add.6–10. Alpine broadly invokes *Axon* to support subject matter jurisdiction over all of its claims. Alpine Br. 1. *Axon* upheld

Congress's general power to create special statutory review schemes that divest district courts of jurisdiction. 598 U.S. at 185. Clearing agencies are subject to such a scheme—the SEC reviews any disciplinary sanctions they issue pursuant to 15 U.S.C. § 78s(d)(1)–(2), and persons aggrieved by any resulting order from the SEC are entitled to review by a United States Court of Appeals under 15 U.S.C. § 78y(a). *See, e.g.*, *Axon*, 598 U.S. at 185 (acknowledging that the Exchange Act's review channeling scheme generally precludes district courts from exercising jurisdiction); *Alpine Sec. Corp. v. FINRA*, 2021 U.S. Dist. LEXIS 170482, at *4–14 (D. Utah Sept. 7, 2021) (dismissing Alpine's due process claims against disciplinary action taken by FINRA because the same statutory scheme as here divested the district court of jurisdiction).

While acknowledging Congress's power to channel review through administrative agencies, *Axon* created a narrow exception, giving district courts jurisdiction to consider "far-reaching constitutional claims" challenging "the structure or very existence of an agency." 598 U.S. at 185, 189. For example, *Axon* dealt with claims that the structures of the SEC and FTC violated Article II of the Constitution. *Id.* at 180. The *Axon* Court contrasted those broad existential claims with challenges to "any specific substantive decision—say, to fining a company or firing an employee"—or "the commonplace procedures agencies use to make such a decision," which should be shunted to administrative agencies. *Id.* at 189.

Alpine's due process claim falls into the latter category. It is not the sort of structural, existential challenge that *Axon* excepted from statutory review mechanisms, but merely a challenge to the "commonplace procedures" applicable to Alpine's specific CTA proceeding—precisely the kind of claim that the Exchange Act's review scheme contemplates.

*Axon*'s reasoning bears this out. *Axon* reaffirmed the Supreme Court's prior decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 202–04 (1994), which held that a similar statutory review framework divested a district court of jurisdiction over a litigant's due process claim. *See* Add.7. *Axon* applied the three-factor test set forth in *Thunder Basin*, asking (1) whether the statutory review mechanism would effectively "foreclose all meaningful judicial review of the claim"; (2) whether the claim is "wholly collateral to a statute's review provisions"; and (3) whether the claim is "outside the agency's expertise." *Axon,* 598 U.S. at 186 (quotation marks and citation omitted).

The district court here correctly applied these factors to determine that Alpine's due process claim was subject to the Exchange Act's review scheme, rendering the court without jurisdiction. *See* Add.9–10. A finding of jurisdictional preclusion (1) would not foreclose all meaningful judicial review, as Alpine is already pursuing the same claim in its petition before the SEC for review of the Hearing

Panel's CTA decision,[9] and judicial appeal under 15 U.S.C. § 78y(a) will be available after that. *See also* 15 U.S.C. §§ 78s(b), 78q-1(d); *Axon*, 598 U.S. at 190–92. Nor is its due process claim (2) wholly collateral to the statute's review provisions because it does not challenge the Clearing Agencies' existence or power to proceed, but rather the particular procedures of NSCC and DTC's disciplinary hearing, Add.9; *see also* Alpine Br. 51–52; *Axon*, 598 U.S. at 192–93, as Alpine effectively concedes. *See* Alpine Br. 54 (challenging other *Thunder Basin* factors, but not collateralism). And due process claims concerning securities SRO hearing proceedings are (3) well within the SEC's expertise. Not only does the SEC regularly evaluate such proceedings under the Exchange Act's own "fair procedure" requirement, 15 U.S.C. § 78q-1(b)(3)(H), but it has also reviewed direct due process challenges targeting them, *see, e.g.*, *In re Applications of Edward Beyn & Craig S. Taddonio,* SEC Admin. Proc. Nos. 3-19007, 3-19012, 2023 WL 3017562, at *17–18 (Apr. 19, 2023); *In re Application of Joseph G. Chiulli*, SEC Admin. Proc. No. 3-9776, 2000 WL 91733, at *5 (Jan. 28, 2000). In sum, Alpine's due process argument is exactly the kind of claim Congress intended the Exchange Act's review provisions to cover.

[9] Pet'n for Review 2, *In re Application of Alpine Securities Corp.*, SEC Admin. Proc. No. 3-21924 (Apr. 30, 2024), *available at* https://www.sec.gov/files/litigation/apdocuments/3-21924-2024-04-30-application-review.pdf.

Alpine's baseless assertion that its "due process claim is [] inextricably intertwined with its other constitutional claims," Alpine Br. 53, does not alter this conclusion. As the district court correctly held, jurisdiction must exist as to each claim independently. Add.9. A ruling in favor of Alpine on due process would potentially lead to vacatur of any disciplinary sanction; it would not alter "the structure or very existence" of NSCC. *Axon*, 598 U.S. at 189. Accordingly, the district court correctly concluded that it was without jurisdiction to hear Alpine's due process claim.

## II. The District Court Correctly Dismissed Alpine's Amended Complaint for Failure to State a Claim.

### A. Alpine's Structural Constitutional Challenges Fail Because The Clearing Agencies Are Private, Non-Governmental Entities.

The district court correctly dismissed Alpine's Appointments Clause and separation of powers claims. Under the operative test, provided in *Lebron,* 513 U.S. at 397–99, the Clearing Agencies are private, non-governmental entities that are not bound by the Appointments Clause. And Alpine's novel state-action test is both unprecedented and unworkable.

#### *1. The Clearing Agencies Are Private Entities Under* Lebron.

As the Supreme Court has held, SROs in the securities industry are private entities not subject to constitutional constraints. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 484–85 (2010) (expressly contrasting "private self-

regulatory organizations" subject to SEC oversight with "Government-created, Government-appointed" entities). Decades of circuit court decisions have so held.[10] As SROs, the same rule applies to the Clearing Agencies.

Nowhere is the proscription against applying constitutional requirements to private entities stronger than in connection with structural constitutional obligations. The structural provisions of the Constitution—which set forth the powers, duties, and structural interrelations of the three branches of the federal government—apply on their face only to government officers and entities. *See Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 590 U.S. 448, 459–60 (2020); *see also Kim*, 698 F. Supp. 3d at *163 n.12, 164. The Appointments Clause says the President "shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States" who hold principal offices "established by Law." U.S. Const. art. II, § 2, cl. 2. Each of those positions belongs to the federal government, and the catch-all that follows must be interpreted consistently.

---

[10] *See, e.g.*, *Epstein v. SEC*, 416 F. App'x 142, 148 (3d Cir. 2010) (holding NASD is a private actor not subject to constitutional mandates); *Galuska v. N.Y. Stock Exch.*, 2000 WL 347851, at *2 (7th Cir. Apr. 3, 2000) (NYSE); *Desiderio v. NASD, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999) (NASD); *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997) (NASD); *see also Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) (vacated) (noting that "[i]n case after case, the courts have upheld" the SEC oversight model for securities SROs as constitutional). This Court has not yet had occasion to address their status. *See McCune v. SEC*, 672 F. App'x 865, 870 (10th Cir. 2016) (acknowledging the question but having no need to determine "whether constitutional mandates apply" to FINRA).

*See Yates v. United States*, 574 U.S. 528, 543 (2015). Likewise, the President's removal power, which flows from Article II and the separation of powers, is limited to "executive officers," whom the President keeps "accountable[] by removing them." *Free Enter. Fund*, 561 U.S. at 483.

Founding-era scholarship and historical practice support the conclusion that Article II applies only to officials within the federal government. *See Lucia v. SEC*, 585 U.S. 237, 241 (2018) (describing "Officers of the United States" as "a class of government officials"); *id.* at 253 (Thomas, J., concurring) (discussing sources supporting proposition that "Officers of the United States" refers exclusively to "federal civil officials with responsibility for an ongoing statutory duty" (citation omitted)); *United States v. Hartwell*, 73 U.S. 385, 393 (1867) ("An office is a public station, or employment, conferred by the appointment of government," and "embraces the ideas of tenure, duration, emolument, and duties."); *see* Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 Stan. L. Rev. 443, 471 (2018) (collecting sources).

The Supreme Court has recognized that, in a small class of situations, nominally private entities may function as parts of the federal government, making them subject to the constitutional duties in Article II. The test is supplied by *Lebron*, 513 U.S. at 383. To qualify as a government entity, a party must be (i) created by the government, (ii) "for the furtherance of government objectives," and (iii) with the government retaining "permanent authority to appoint a majority of the [entity's]

directors." This test is well established as the operative standard in Appointments Clause and separation-of-powers cases. *See, e.g.*, *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 46, 55 (2015) (applying *Lebron* to determine that Amtrak "is a governmental entity, not a private one," for purposes of applying constitutional provisions such as the Appointments Clause and separation of powers); *Free Enter. Fund*, 561 U.S. at 486 (citing *Lebron* in support of parties' agreement that defendant was a "part of the government" such that Appointments Clause and removal requirements applied); *id.* at 550–56 (Breyer, J., dissenting) (indicating agreement that *Lebron* is the operative test); *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 159 (4th Cir. 2018) (rejecting Appointments Clause challenge to Metropolitan Washington Airports Authority because not a government entity under *Lebron*); *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 821 F.3d 19, 27, 36 (D.C. Cir. 2016) (on remand from Supreme Court, applying *Lebron* to determine that Amtrak was a government entity and violated Appointments Clause).

The *Lebron* test answers Alpine's objection that the Clearing Agencies are "permitted to wield government power without being subject to [] constitutional protections" merely because "they bear the label 'private entity.'" Alpine Br. 45. As *Lebron* makes clear, the question turns on concrete factors surrounding an entity's creation, function, and leadership—matters of substance, not mere labels.

The Clearing Agencies do not meet a single prong of the test. It is indisputable that NSCC and DTC were not created by the government and that their leadership is not appointed by the government. *See* Add.11. Nor are clearing and settling "governmental objectives," *Lebron*, 513 U.S. at 398, let alone "quintessential government function[s]," as Alpine claims. *See* Alpine Br. 5. On the contrary, clearance and settlement have *always* been private functions carried out by private actors to facilitate private transactions. *See Pet Quarters*, 559 F.3d at 776. Long before Congress sought to encourage clearing agencies' participation in a coordinated clearance and settlement system in the 1970s, private exchanges carried out those functions through their own subsidiaries. *See id.*; SEC Concept Release, 69 Fed. Reg. at 71,257. It was private subsidiaries like those that eventually combined to form NSCC, and DTC was similarly formed through the collaboration of private exchanges. Congress conferred authority on the SEC to "*facilitate the establishment of* a national system for the prompt and accurate clearance and settlement of transactions in securities." 15 U.S.C. § 78q-1(a)(2)(A)(i) (emphasis added). Contrary to Alpine (Alpine Br. 5, 20–22), Congress did not empower the SEC to clear and settle transactions, and hence the SEC could not delegate that power.

Accordingly, under the governing *Lebron* test, the Clearing Agencies are not government entities, and "the Appointments Clause says nothing about them." *Kim*,

698 F. Supp. 3d at 164 (quoting *Fin. Oversight & Mgmt. Bd. for P.R.*, 590 U.S. at 459–60).

### *2. The Court Should Reject Alpine's Invitation to Adopt a New State-Action Test for Structural Constitutional Claims.*

Recognizing that *Lebron* is fatal to its Article II claims, Alpine argues for the application of a different test for structural constitutional claims—namely, whether the entity has engaged in "state action." But, as the district court succinctly put it, state action is "not the test" for separation of powers or the Appointments Clause. Add.11.

Private persons or entities engage in state action when their conduct can be fairly attributed to the State. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *see Anderson v. Kitchen*, 389 F. App'x 838, 840 (10th Cir. 2010). But even where the State bears legal responsibility for an *action*, it says nothing about whether the *actor* is considered a government official, with all the accompanying legal consequences, including the strictures of constitutional appointment and removal. It is simply a non-sequitur to argue that because an entity performs some form of state action, its board members must automatically become officers of the United States.

Moreover, Alpine's position is contrary to law and unworkable.

*First,* as the district court noted when it denied Alpine's TRO motion, Alpine could not cite a single judicial decision that relied on state action to determine that

the Appointments Clause or separation of powers applies. App.1.69. That observation remains true. Many of the cases Alpine cites are obviously inapposite because they deal with unambiguously non-private, governmental entities. *See Lucia*, 585 U.S. at 251 (SEC) (cited at Alpine Br. 43, 45–47); *Collins v. Yellen,* 594 U.S. 220, 228–29 (2021) (Federal Housing Finance Agency) (cited at Alpine Br. 48); *Fin. Oversight & Mgmt. Bd. for P.R.,* 590 U.S. at 455–56 (Congressionally appointed control board overseeing Puerto Rico's bankruptcy) (cited at Alpine Br. 43, 48). The remaining cases Alpine cites are similarly distinguishable. *See United States v. Ackerman*, 831 F.3d 1292, 1300 (10th Cir. 2016) (applying *Lebron* test and affirming it provides the relevant rule for determining whether a nominally private organization is part of the government) (cited at Alpine Br. 45, 48–49).[11]

Alpine relies heavily on a partial dissent in *Alpine Securities Corp. v. FINRA*, 121 F.4th 1314, 1338–51 (D.C. Cir. 2024) (Walker, J., concurring in judgment in part and dissenting in part) (cited in Alpine Br. 46), which questioned the applicability of the non-delegation doctrine, but even that opinion acknowledged that

[11] Similarly, the OLC opinion Alpine cites (Alpine Br. 48–49) did not discuss state action. To the contrary, it said the Appointments Clause does *not* generally apply to actors who exercise delegated authority on a "temporary," "transient," or "incidental" basis, contradicting Alpine's theory that state action gives rise to Appointments Clause obligations. *See Officers of the U.S. Within the Meaning of the Appointments Clause*, DOJ Off. Legal Counsel, 2007 WL 1405459, at *3 (Apr. 16, 2007).

FINRA was not a state actor. *Id.* at 1346 & n.75. And the *FINRA* majority rejected the dissent's views about the doctrine. *Id.* at 1328–29. Furthermore, the dissent's reasoning conflicted with decades of precedent across circuits holding that the Constitution's appointments and removal provisions apply only to government officials. *See Lucia*, 585 U.S. at 241; *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 805 (10th Cir. 2002).

The *FINRA* case is also readily distinguishable because it dealt with FINRA, a securities SRO with different powers and duties, including the direct enforcement of securities laws, *see* 15 U.S.C. § 78s(g)(1)(B), (h)(1)(B), (h)(2)(B), (h)(3)(B), (h)(4)(b). The Clearing Agencies do not have the same responsibilities or authority. *See id.* § 78s(g)(1)(A)–(C), (h)(1)–(2).

*Second,* Alpine's proposed state-action test is irreconcilable with existing case law. It clashes with well-established jurisprudence holding that delegations of governmental authority (including executive power) are constitutionally permissible so long as a governmental entity oversees the private entity's exercise of delegated authority. *See Consumers' Rsch.*, 145 S. Ct. at 2507–10; *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940). Adoption of Alpine's loose state-action standard as a litmus test would convert *all* private recipients of delegated executive power, regardless of the oversight to which they are subject, into government entities

themselves. No longer could any delegation of executive power take place—regardless of how carefully Congress calibrated a detailed statutory oversight scheme—since Alpine's test would effectively outlaw it. That is not the law.

*Third,* the test would be unworkable in practice. The Appointments Clause does not flip on or off depending on whether a private entity happens to be engaging in specific conduct that qualifies as state action. An entity is either part of the federal government or it is not.

A contrary conclusion would cause a panoply of problems. It would impose Appointments Clause and removal requirements on all manner of private entities, no matter how ill-fitting those constraints. For instance, one of the authorities Alpine relied on below, *see* App.2.14, 17, held that Xerox was engaged in state action when a Xerox computer system consulted by pharmacists would make Medicaid eligibility determinations. *See N.B. ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015). Under Alpine's seemingly limitless test, it would follow that Xerox is subject to the Appointments Clause. That is a facially absurd result. An entity's engagement in a particular, limited activity—as is typical with instances of state action—should not dictate permanent changes to its structure. *See, e.g., United States v. Fortney*, 772 F. App'x 269, 274, 276 (6th Cir. 2019) (Aldi grocery-store supervisor who searched a former employee's bag with the aid of police officers engaged in state action).

Further, Alpine's standard would raise a whole host of vexing problems, such as which particular employees or executives of a private company would become "Officers of the United States"; whether they would require appointment by the President with the advice and consent of the Senate; how and whether they could be simultaneously employed by both their corporation and the federal government; whether federal rules governing diverse subjects such as ethics and restrictions on political activities would apply to them; how appropriations for wages and salaries would work; whether they would be subject to impeachment and removal; and so on. And such questions would abound for *every* private entity that engaged in state action, no matter how fleeting. In short, the entire doctrine would be fraught with uncertainty and confusion.

Finally, even if state action were somehow relevant to these claims, the Clearing Agencies do not engage in state action, as discussed below. *See* Point II.B, *infra.*

### B. The Private Non-Delegation Claim Fails Because There Is No Unconstitutional Delegation Here.

Alpine's private non-delegation claim fails because the SEC holds ultimate authority over the Clearing Agencies' activities. Add.13–16. Just a few months ago, the Supreme Court reaffirmed the longstanding test for constitutional private delegations. *See Consumers' Rsch.*, 145 S. Ct. at 2507–2511, *rev'g* 109 F.4th 743 (5th Cir. 2024) (en banc) (cited at Alpine Br. 18, 20, 31). The operative test asks simply whether the government entity supervising a private actor retains final authority over

the latter's actions. *See id*. at 2509 (holding that agency retained "final authority" over the private entity where it reviewed and approved the entity's determinations). Where the supervising agency retains such power, the private entity remains "broadly subordinate" and its exercise of delegated governmental authority is permissible. *Id.* at 2508; *accord Adkins*, 310 U.S. at 399 (upholding delegation of power to private coal producers to propose regulations subject to a government agency's approval because the agency's ultimate "authority" over those regulations meant that "law-making [was] not entrusted to the industry").

*Consumers' Research* involved a challenge to a private entity's delegated rulemaking authority. The Universal Service Administrative Company (the "Administrator") is a private company that administers a fund designed to support universal telecommunications service in the United States, especially in rural and low-income areas. The case focused on the Administrator's authority to promulgate revenue and expense projections that would be used to determine contribution rates for industry participants to the fund. *See Consumers' Rsch.*, 145 S. Ct. at 2495. The Court held that the Administrator was "broadly subordinate" to the FCC—and therefore acting in compliance with the non-delegation doctrine—because (i) it was required to carry out its tasks "consistent with" the FCC's rules and directives, (ii) the Administrator's projections used to dictate contribution rates were required to undergo FCC review and approval, and (iii) "anyone aggrieved by an action of the

[private entity] [could] seek *de novo* review by the [FCC]." *Id*. at 2508–09. In that rulemaking context, the Court also found it material that the Administrator was not independently setting policy, but rather that "the private party's recommendations [could not] go into effect without an agency's say so." *Id.*

The SEC enjoys the same degree of oversight over the Clearing Agencies as the FCC did over the Administrator in *Consumers' Research.* The SEC maintains stringent registration criteria and has the power to suspend or revoke a clearing agency's registration based on its level of compliance with the Exchange Act, the SEC's rules, and internal clearing-agency rules. 15 U.S.C. § 78s(g)–(h). The SEC must also approve proposed clearing-agency rules after public notice and comment before they go into effect—just as it did with the new ENC requirements in 2022. *Id.* §§ 78q-1; 78s(b)(1). And clearing agencies must notify the SEC of any disciplinary action or adverse membership decision they take, the SEC may review them unilaterally or by application, and they are subject to subsequent federal judicial review. *See id.* §§ 78s(b), 78s(d), 78y. In light of this extensive statutory oversight, numerous courts have held (and Alpine's own authorities recognize) that delegations of authority to securities SROs operating under the same general statutory scheme as the Clearing Agencies are constitutionally permissible. *Oklahoma*, 62 F.4th at

229 (vacated) (collecting cases across circuits); *accord Nat'l Horsemen's Benevolent & Protective Ass'n v. Black (Horsemen's II)*, 107 F.4th 415, 433–35 (5th Cir. 2024). So too for the Clearing Agencies.

Alpine challenges alleged delegations of authority to the Clearing Agencies in both the rulemaking and adjudicatory contexts. Neither challenge has merit.

#### ***1. Alpine's Challenge to the Clearing Agencies' Delegated Authority to Promulgate Rules Fails.***

Alpine challenges the Clearing Agencies' delegated rulemaking authority on multiple grounds. Because the SEC must review and approve Clearing Agency rules before they go into effect, those challenges fail.

*First*, Alpine asserts that the SEC's review of Clearing Agency rules for mere "consistency" with the Exchange Act is inadequate. Alpine primarily relies on *National Horsemen's Benevolent & Protective Association v. Black ("Horsemen's I")*, 53 F.5th 869 (5th Cir. 2022), for the notion that so-called "consistency review" is insufficient. *See* Alpine Br. 27–29. *Consumers' Research* implicitly rejected that approach, however. The Supreme Court did not draw distinctions based on the mode of review, focusing only on whether or not the agency had ultimate approval authority. *See* 145 S. Ct. at 2507–2510; *cf. id.* at 2509 (rejecting argument that agency review was "rubber stamp[ing]" actions of the private entity, reasoning that it was sufficient that the private entity's recommendations required approval of regulatory

agency, "regardless of how freely given"). The SEC indisputably has such authority over the Clearing Agencies here.

*Second*, Alpine argues that the SEC's power under 15 U.S.C. § 78s(c) to amend other securities SROs' rules unilaterally—a power that two of Alpine's authorities have emphasized—does not extend to the Clearing Agencies, so their exercise of delegated authority must be unconstitutional. Alpine Br. 41–45. That claim fails for a number of reasons. As an initial matter, Alpine bases its argument on cases from the Fifth Circuit and the Sixth Circuit, *Oklahoma*, 62 F.4th 221 (cited at Alpine Br. 26–32, 36–37), and *Horsemen's II*, 107 F.4th 415 (cited at Alpine Br. 13, 22, 30, 32, 35–40, 42, 45). But the Supreme Court vacated both decisions and remanded them for further consideration in light of *FCC v. Consumers' Research*. *See Oklahoma v. United States*, No. 23-402, 2025 WL 1787679 (U.S. June 30, 2025) (vacating *Oklahoma*); *Horseracing Integrity & Safety Authority, Inc. v. Nat'l Horsemen's Benevolent & Protective Ass'n*, No. 24-429, 2025 WL 1787684 (U.S. June 30, 2025) (vacating *Horsemen's II*). Thus, they are no longer good law.

And even if those Circuits were to reaffirm those decisions, Alpine's argument would still be meritless. Alpine is looking for statutory authority in the wrong place. Although § 78s(c) does exclude clearing agencies, the Exchange Act grants the SEC superior rulemaking power in § 78q-1(d), which authorizes the agency to prescribe "rules and regulations" applicable to clearing agencies "as necessary or

appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]"—language that does not appear in the provisions that specifically apply to the other SROs subject to § 78s(c). *See generally* 15 U.S.C. §§ 78f (national securities exchanges); 78o-3 (national securities associations).

That unique rulemaking power encompasses and goes beyond the mere ability to dictate clearing agencies' internal rules. Pursuant to that authority, the SEC has promulgated rules that explicitly require clearing agencies to change their own internal rules using the notice and comment process—which, as in the example of the ENC rule change described above, further requires additional SEC review and approval. *See, e.g.*, *Clearing Agency Governance and Conflicts of Interest*, 88 Fed. Reg. 84,454, 84,490, 84,509 (Dec. 5, 2023); *Standards for Covered Clearing Agencies*, 81 Fed. Reg. at 70,788 & n.14, 70,800–801; *Clearing Agency Standards*, 77 Fed. Reg. 66,220, 66,221 & n.6, 66,228–229 (Nov. 2, 2012). Indeed, Alpine itself acknowledged this point in its own pleadings. *See* App.1.31 ¶ 63(c) ("The SEC has the authority to abrogate, amend or delete an existing rule of an SRO, including the rules of registered clearing agencies."); Compl. ¶ 56(c), ECF No. 2, Case No. 2:23-cv-00782-JNP (D. Utah Oct. 27, 2023) (same).

Such power, especially in conjunction with the SEC's various other registration and review powers, ensures that the SEC has plenary control over clearing-

agency rules, status, and conduct, "retain[ing] ultimate authority over the implementation of [the Exchange Act]," notwithstanding § 78s(c)'s carve-out. *Oklahoma*, 62 F.4th at 231–32 (vacated). If anything, the SEC has *greater* power over the Clearing Agencies and their internal rules under this regime than it does other securities SROs. Alpine's attempt to exclude the Clearing Agencies from the widely accepted securities SRO model therefore fails.

### 2. *Alpine's Challenge to the Clearing Agencies' Adjudicatory Authority Fails.*

Alpine's challenge to the Clearing Agencies' authority to adjudicate and sanction rule violations among its members fares no better. Alpine argues that the Clearing Agencies' power to implement disciplinary sanctions before the SEC reviews them runs afoul of the private non-delegation doctrine. Alpine Br. 32–42. That is wrong. Alpine relies largely on the D.C. Circuit's self-described narrow ruling in *Alpine v. FINRA*, which held that when "SEC review is not available as a practical matter in expedited expulsion proceedings prior to businesses being forced to close, . . . that gap runs afoul of the private nondelegation doctrine." 121 F.4th at 1331; *see also Smith v. FINRA*, 2025 WL 985447, at *2 (D.D.C. Apr. 2, 2025) ("The upshot of *Alpine*'s holding is that *only* immediate, unreviewable expulsion justifies preliminary relief; every FINRA sanction short of such expulsion does not.") (emphasis added). *FINRA* was a narrow ruling based on facts materially different from those here.

*First*, the CTA sanction here does not preclude Alpine from participating in the securities industry as a matter of law. The D.C. Circuit emphasized that "expulsion from FINRA . . . effectively amounts to being barred from the securities industry." 121 F.4th at 1325. That is because "federal law prohibits entities from trading securities unless they are a member of a registered securities association." *Id.* at 1326 (citing 15 U.S.C. § 78o(b)(1)). In the D.C. Circuit's eyes, that factor made expulsion from FINRA "unique." *Id.* at 1331.

As the district court correctly determined, the same is not true for the Clearing Agencies. "Unlike FINRA, Defendants alone do not 'effectively decide who can trade securities under federal law.'" Add.16 (quoting *FINRA*, 121 F.4th at 1328).[12] Rather, the only thing the CTA would do is block Alpine from clearing securities transactions directly through NSCC. *See* Alpine Br. 38 ("The SEC has stated that the Clearing Agencies' CTA sanction means that a broker-dealer 'could no longer operate as a *self-clearing* broker'" (citation omitted) (emphasis added)). Alpine would remain free to engage in stock trading and to clear trades through another

[12] The district court thought that Appellees were not the only clearing agencies registered with the SEC, and thus the CTA did not have the same legal effect as FINRA's expulsion decision. Add.16. While the court was mistaken about the premise (there are other registered clearing agencies, but they clear different kinds of securities), its conclusion was still correct. Unlike FINRA expulsion orders, CTAs merely prohibit subject parties from clearing directly with the Clearing Agencies; those parties may still remain in the securities industry and clear through other Members, as discussed below.

member, just like Alpine has long done for its affiliate, Scottsdale. Accordingly, nothing prevents it from continuing to access the United States securities markets.

*Second*, unlike in *FINRA*, the Clearing Agencies delayed implementation of the CTA to provide Alpine time to seek review by the SEC. As the D.C. Circuit noted, its opinion "does not speak to . . . FINRA's own ability to delay the effectiveness of its expulsion orders in expedited proceedings." 121 F.4th at 1331. Whereas the challenged FINRA expedited proceeding was in progress when Alpine obtained the injunction halting it, here the Clearing Agencies' (non-expedited) disciplinary hearing has already concluded, following which the Clearing Agencies delayed implementation of the CTA to afford Alpine an opportunity to petition the SEC. *See* Administrative Stay at *1 n.2. Alpine sought SEC review and a stay during that time, and the SEC administratively stayed the action pending consideration of those motions, which remains in effect. *Id.* at *1; Alpine Br. 9. Thus, the district court was correct that "[u]nlike in the *FINRA* case, Plaintiff has not shown on the record that clearing agency cease to act orders 'take effect immediately, before the SEC can review them.'" Add.16 (citing 121 F.4th at 1326).[13]

[13] Although dicta in *FINRA* opines that the SEC's consideration of a stay motion "likely" would not count as review of the SRO's action sufficient to satisfy the private non-delegation doctrine, *see* 121 F.4th at 1326–28, that conclusion is questionable here. While stay determinations are always preliminary to a degree, here the SEC has the full record before it, *see* SEC Rule of Practice 420(e), and it has had over 15 months to consider the merits of Alpine's review petition. Moreover, the

*Third*, the CTA is not an exercise of delegated federal authority. To begin with, the Clearing Agencies here are only enforcing their own internal rules that require accurate financial reporting and compliance with risk-based financial requirements; they are not enforcing federal law. As the D.C. Circuit held, an SRO's enforcement of its own rules does not violate the private non-delegation doctrine. *Id.* In fact, unlike FINRA, the Clearing Agencies are not even *authorized* to enforce federal law. *Compare* 15 U.S.C. § 78s(g)(1)(C) (requiring every clearing agency to "enforce compliance . . . with its own rules by its participants") *with, e.g.*, *id.* § 78s(g)(1)(B) (requiring every registered securities association, a different class of securities SRO (including FINRA), to "enforce compliance . . . with [] provisions [of this chapter, regulatory rules thereunder, and their own rules] by its members and persons associated with its members"); *see also id.* § 78s(h)(1)(A)–(C), (h)(2)(A)–(C), (h)(4)(A)–(C).

---

SEC employs a modified stay standard—which the *FINRA* court overlooked—that requires the issuance of a stay so long as the petitioner raises merely "a serious legal question" on the merits, in combination with a showing of irreparable harm. *See, e.g.*, *In re Application of KJM Secs. for Review of Disciplinary Action Taken by FINRA*, SEC Release No. 23-88053, 2020 WL 416696, at *1–2 (Jan. 27, 2020). Especially given the ruling in *Consumers' Research* that agency review and approval authority—regardless of the form it takes—is the key determinant of constitutionality, the SEC's consideration of the merits in the stay context should suffice. *See* 145 S. Ct. at 2507–10; *cf. id.* at 2509 (even agency "rubber stamp[ing]" is sufficient because the private entity's actions were subject to agency approval, "regardless of how freely given"). Nevertheless, the Court need not reach this question because *FINRA* is distinguishable for the other reasons provided herein.

Moreover, in *FINRA*, the sole application of executive authority at issue was the expulsion order, because it would have revoked Alpine's required registration under 15 U.S.C. § 78o(b)(1), barring Alpine from the securities industry as a matter of federal law. *FINRA*, 121 F.4th at 1328. But a CTA decision, unlike FINRA's expulsion order, is not a statutory sanction. *See id.* § 78o(b)(1). It is not an "authority bestowed by the federal government." *FINRA*, 121 F.4th at 1328. Accordingly, there is no exercise of delegated authority here that could run afoul of the private non-delegation doctrine.

Just as *FINRA* does not support Alpine's arguments, neither do *Oklahoma* and *Horsemen's II*, even apart from the fact that those decisions have been vacated. *See* Point II.B.1, *supra*. Alpine argues that the Sixth Circuit upheld HISA's enforcement scheme only because the private horseracing authority's decisions there were "not final" until the FTC had reviewed them. Alpine Br. 37 & n.20. By contrast, it claims, Clearing Agency disciplinary decisions and sanctions "must be final" before SEC review is triggered. *Id.* But that argument merely reflects an ambiguity in the use of the word "final." When the *Oklahoma* court said the horse racing authority's decisions were "not final," it just meant that the authority's decisions were subject to the FTC's review. 62 F.4th at 231 (citation omitted). The same is true of Clearing Agency decisions, which are subject to SEC review. *See* 15 U.S.C. § 78s(d)–(f). And conversely, both HISA and the Exchange Act require that the private entity's

imposition of a sanction be "final"—*i.e.*, not interim or subject to further SRO modification—before becoming reviewable by the FTC and SEC, respectively. *See* 15 U.S.C. § 3058(c)(1)–(2) (only authority's "final civil sanction" reviewable by FTC); 15 U.S.C. § 78s(d) (only securities SROs' "final disciplinary sanction" reviewable by SEC).

More important, sanctions under both the SEC and FTC regimes could take effect before review. As a concurrence pointed out, review of the horseracing SRO's disciplinary actions did not stay them. *See Oklahoma*, 62 F.4th at 243 (Cole, J., concurring); 15 U.S.C. § 3058(d). The sources *Oklahoma* cited likewise upheld provisions—including the review scheme here—involving an SRO's already-imposed penalties, so long as the agency later had power to "reduce, cancel, or leave [them] undisturbed." *Todd & Co. v. SEC*, 557 F.2d 1008, 1012–14 (3d Cir. 1977); *see Oklahoma*, 62 F.4th at 231 (citing *Todd*); *see also* Add.13–14 (collecting cases). These sources also underscore the limited nature of the *FINRA* court's holding, which did not purport to create a circuit split, but instead focused narrowly on FINRA's particular expedited expulsion order, rather than SRO sanctions in general.

Of course, *Horsemen's II* disagreed with *Oklahoma* regarding the sufficiency under the private non-delegation doctrine of the horseracing authority's after-the-fact review. But that disagreement has no bearing in the context of the SRO powers of the Clearing Agencies. In contrast to the private horseracing authority involved

in both cases, the Clearing Agencies are not empowered to enforce federal law, including the Exchange Act. *Compare, e.g.*, 15 U.S.C. § 78s(g)(1)(C) (requiring clearing agencies only to enforce their own rules, not federal law) *with Horsemen's II*, 107 F.4th at 429 (detailing the various ways that the relevant federal law "is enforced by a private entity, the Authority"). Rather, they merely exercise the historically private power to enforce their own internal rules. *Cf. FINRA*, 121 F.4th at 1328. And more fundamentally, *Horsemen's II* distinguished what it held to be the Horseracing Authority's unconstitutional exercise of delegated enforcement authority from FINRA's long-standing constitutional exercise of delegated enforcement authority, emphasizing the SEC's extensive oversight over FINRA and other securities SROs (which include the Clearing Agencies) under the Exchange Act. *See Horsemen's II*, 107 F.4th at 433–35; *see also Oklahoma*, 62 F.4th at 229.

Finally, *FCC v. Consumers' Research* does not alter this analysis. That case ostensibly dealt with delegated *rulemaking* authority, not delegated *enforcement* authority—a distinction that even Alpine's authorities recognize. *See, e.g.*, *Oklahoma*, 62 F.4th at 229–31 (vacated). Accordingly, the majority's observation that a regulatory scheme where the private party's recommendations could not "go into effect without an agency's say-so" would be "sufficient" to pass muster under the private non-delegation doctrine, *Consumers' Research*, 145 S. Ct. at 2509, refers to rulemaking processes—and in particular the rate-setting framework before the court—

rather than adjudicatory processes like the one here, which have been upheld time and again under this specific statutory scheme. *See Oklahoma*, 62 F.4th at 229 (vacated) (collecting cases). Indeed, the line of cases described in *Oklahoma* is built off the standards articulated in *Sunshine Anthracite*, which the Supreme Court expressly reaffirmed in *Consumers' Research*. For all these reasons, those limits do not reach this case.

### C. Alpine's Due Process Allegations Fail to State a Claim.

Although the district court had no need to reach the merits of Alpine's due process claim in light of its jurisdictional ruling, that claim's insufficiency as a legal matter provides an additional basis for this Court to affirm. *See, e.g.*, *Watkins*, 135 F.4th at 1229 ("We may affirm the district court's dismissal of [plaintiff's] complaint on any basis supported by the record, even if it requires ruling on arguments not reached by the district court" (citation modified)). Alpine's due process theory fails on the merits for two primary reasons: (i) the Clearing Agencies are not engaged in state action, and (ii) Alpine's threadbare factual allegations fail to make out a due process claim, and are decisively foreclosed by relevant case law.

#### *1. Alpine Fails to Establish State Action.*

Alpine's due process claim fails at the threshold because the Clearing Agencies are simply not engaged in state action. Circuit courts have repeatedly rejected

due process challenges to securities SRO activities—including enforcement or membership-revocation proceedings—based on a lack of state action. *See, e.g.*, *Perpetual Secs., Inc. v. Tang*, 290 F.3d 132, 137–39 (2d Cir. 2002) (NASD was not engaged in state action, rendering due process claim inapplicable); *accord Epstein*, 416 F. App'x at 148; *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155 (2d Cir. 2002); *Desiderio*, 191 F.3d at 206–07. This case calls for the same outcome.

Again, whether an entity is engaged in state action turns on whether its specific acts are "fairly attributable to the State." *Lugar*, 457 U.S. at 923; *see also Beedle v. Wilson*, 422 F.3d 1059, 1065 (10th Cir. 2005). Following the Supreme Court's guidance, this Circuit has applied several tests for state action, two of which Alpine mentions in passing: (i) public function and (ii) symbiotic relationship. Alpine Br. 49; *see Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995). The Clearing Agencies' alleged conduct cannot be attributed to the State under either of those standards,. Perhaps for that reason, Alpine more often vaguely describes the Clearing Agencies as "exercis[ing]" generic "executive power," *see, e.g.*, Alpine Br. 22, 42–45, 50, even though that is not the name of any recognized state-action test.

*First,* Alpine invokes the "public function" test, which considers whether a private entity is performing functions that were "traditionally exclusively" reserved

to the State. *See Gallagher,* 49 F.3d at 1456. The provision of clearance and settlement services and other self-regulatory activities carried out to support them, however, have always been *private* functions undertaken by *private* entities—not the government. *See* Statement of the Case Point A, *supra*. SEC oversight does not make them public or governmental, since "being regulated by the State does not make one a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 816 (2019); *Bernstein*, 738 F.2d at 186 (observing that federal regulation does not compel SROs to perform state functions, but rather strengthens SRO power to perform private functions that "preexisted federal regulation").[14]

*Second*, Alpine invokes the "symbiotic relationship" test, characterizing the Clearing Agencies as "joint participant[s]" with the government in the challenged activity and "entwined" with the government.[15] That is a non-starter. The SEC and the Clearing Agencies have not coordinated to launch a joint enterprise to which each is indispensable—the emblematic (if exceedingly rare) set of circumstances triggering state action by symbiotic relationship. *See Wasatch Equal. v. Alta Ski*

---

[14] For the same reason, the "sufficiently close nexus" test, *see Gallagher*, 49 F.3d at 1447, would also fail to show state action here, *see D.L. Cromwell*, 279 F.3d at 161 (collecting cases showing that, "[u]nder the [nexus] test, even heavily-regulated private entities . . . generally are held not to be state actors") (citation omitted).

[15] This Circuit equates the "symbiotic relationship" test and the "entwinement" test, which Alpine repeatedly mentions. *See Wittner v. Banner Health*, 720 F.3d 770, 778 (10th Cir. 2013) (equating "entwinement" and "symbiotic relationship" tests); *accord Johnson v. Rodrigues,* 293 F.3d 1196, 1205 (10th Cir. 2002).

*Lifts Co.*, 820 F.3d 381, 388–89 (10th Cir. 2016) (discussing key Supreme Court and Tenth Circuit cases). As discussed above, NSCC and DTC were privately founded, are privately owned, and bear responsibility for their own operations and funding.

Alpine's own cases do not support its state-action theory. *Brentwood Academy v. Tennessee Secondary School Athletic Association,* 531 U.S. 288 (2001), does not support "entwinement" because the Clearing Agencies are not comparable to the Tennessee Secondary School Athletic Association on any relevant metric. While the Association was comprised almost entirely of public schools and public-school officials who "overwhelmingly perform[ed] all but [its] purely ministerial acts," *Brentwood*, 531 U.S. at 299–300, the Clearing Agencies are comprised solely of private personnel. In addition, whereas the Association received most of its financial support from public schools, *id.*, the Clearing Agencies do not receive any public funding.

Alpine misreads another out-of-circuit case, *Whistler Investments, Inc. v. Depository Trust & Clearing Corp.*, 539 F.3d 1159 (9th Cir. 2008), to argue that the "activities of the Clearing Agencies are so entwined with governmental prerogatives that the rules the Clearing Agencies create and enforce have the status of federal law to the point that they preempt contrary state law." Alpine Br. 21. But *Whistler* says nothing about state action, nor does Alpine cite anything for or develop its unsup-

ported assertion that preemption is in any way relevant to the "entwinement" analysis. *Whistler* merely captures another example of the SEC's regulation of securities SROs—it was the SEC's regulation pursuant to Exchange Act § 17A that gave rise to the narrow conflict preemption there, 539 F.3d at 1167—and such regulation does not transform a private entity's activities into state action.

Nor are Alpine's citations to *Rooms v. SEC*, 444 F.3d 1208 (10th Cir. 2006), or *General Bond & Share Co. v. SEC*, 39 F.3d 1451, 1455 (10th Cir. 1994), helpful to its position. Alpine Br. 51. Alpine's assertion that those cases endorsed application of due process requirements to private SROs is wrong. *Rooms* evaluated whether the *SEC* "violated [plaintiff's] due process rights by upholding the permanent bar" imposed by NASD (an SRO)—not whether NASD itself committed any violation. 444 F.3d at 1213. And *Rooms* held that the conduct plaintiff alleged failed to state a due process claim in any event, so the court had no need to pass on the applicability of due process requirements to NASD even if they had been raised. *Id.* at 1214. Similarly, *General Bond & Share Co.* declined to address the applicability of due process requirements to NASD, instead reversing the SEC's affirmance of NASD's disciplinary measures on other grounds. 39 F.3d at 1455. In bypassing the question, the court further noted that the "SEC [did] not challenge the applicability

of the Due Process Clause to the disciplinary proceeding below," thus waiving the issue. *Id.* [16]

#### 2. *Alpine's Due Process Claim Fails on the Merits Because NSCC's and DTC's Rules Provide a Fair Procedure.*

At a more basic level, Alpine fails to demonstrate any due process violation in the first place. Alpine attacks the CTA Hearing Panel's impartiality on the sole basis that its members are board members of NSCC and DTC. But many appellate courts have rejected more serious challenges to the impartiality of substantively identical SRO adjudicatory bodies. *See, e.g.*, *D'Alessio v. SEC*, 380 F.3d 112, 117, 120–22 (2d Cir. 2004) (rejecting impartiality challenge where one member of NYSE disciplinary panel was pursuing separate $25 million civil action against the Exchange); *Epstein*, 416 F. App'x at 149 (rejecting impartiality challenge to FINRA Hearing Officer based on pre-hearing rulings adverse to member). The appointment of board members to serve as hearing officers is typical of other SROs. *See, e.g., D'Alessio*, 380 F.3d at 117 (NYSE hearing panel comprised of "one hearing officer employed by the Exchange and two members of the Exchange").

---

[16] Alpine's other cases are similarly unhelpful to its position. *National Association of Securities Dealers, Inc. v. SEC,* 431 F.3d 803, 806 (D.C. Cir. 2005), and *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995), are inapposite, as the Clearing Agencies are not engaged in enforcement of the Exchange Act, unlike the organizations in those cases. In addition, unlike the Municipal Securities Rulemaking Board, no statute compels industry participants to maintain membership in NSCC or DTC to participate in the securities industry. *See Blount*, 61 F.3d at 941. This distinction eliminates the basis for state action upon which *Blount* relied.

Furthermore, the NSCC and DTC Rules clearly state that any Hearing Panel shall not include "any person who had responsibility for the action or proposed action of [NSCC] as to which the hearing relates." NSCC R. 37 § 4; DTC R. 22 § 5. Alpine ignores this rule in favor of hyperbolic accusations that the Clearing Agencies act as the "prosecutors, judge, jury, and executioner" in CTA proceedings, Alpine Br. 52, but in fact measures are in place to ensure the impartiality of the adjudicators. Nor does Alpine offer any evidence that the Hearing Panel members are unfit to conduct a hearing that will provide "fair procedure" as required under the Exchange Act. 15 U.S.C. § 78q-1(b)(3)(H). Accordingly, Alpine's due process claim also fails as a matter of law.

### D. In All Events, the Court Should Affirm the Dismissal of All Claims As Against DTCC.

Finally, Alpine fails to allege any basis for relief against Defendant DTCC other than that it owns and operates NSCC and DTC, and all three entities have the same board. Alpine makes no particularized allegations about DTCC's conduct. DTCC is a private holding company, not a registered clearing agency or SRO. It does not operate within the same statutory regime as NSCC and DTC, and therefore none of Alpine's challenges touch the parent company. Accordingly, even if any of Alpine's claims were to be reinstated, the dismissal of all claims against DTCC should nevertheless be affirmed. *See Watkins v. Genesh, Inc.*, 135 F.4th 1224, 1229 (10th Cir. 2025) (permitting affirmance "on any basis supported by the record").

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's dismissal of Alpine's Amended Complaint in full.

Dated: August 22, 2025

Respectfully submitted,

*/s/Mark D. Harris*

MARK D. HARRIS
MARGARET A. DALE
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
mharris@proskauer.com
mdale@proskauer.com

ADAM L. DEMING
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
Tel: (617) 526-9850
ademing@proskauer.com

*Attorneys for Appellees National Securities Clearing Corporation, The Depository Trust & Clearing Corporation, and The Depository Trust Company*

## REQUEST FOR ORAL ARGUMENT

Defendants-Appellees respectfully request oral argument, which they believe would be of assistance to the Court in resolving the constitutional issues this appeal presents.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), this document contains 12,997 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

Dated: August 22, 2025

By: /s/ *Mark D. Harris*
Mark D. Harris

*Attorney for Appellees National Securities Clearing Corporation, The Depository Trust & Clearing Corporation, and The Depository Trust Company*

## CERTIFICATE OF SERVICE

I hereby certify that, on 22nd day of August, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system, which will send notifications of such filing to all CM/ECF counsel of record.

Dated: August 22, 2025

By: /s/ *Mark D. Harris*
Mark D. Harris

*Attorney for Appellees National Securities Clearing Corporation, The Depository Trust & Clearing Corporation, and The Depository Trust Company*